1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11   AHMED ALI,                                          Civil No.     14-0898 BAS (WVG)

12                                Petitioner,

13                 v.                                     **REPORT AND**
                                                          **RECOMMENDATION RE:**
14   R.T.C. GROUNDS, et al.,                             **DENYING PETITION FOR WRIT**
                                                          **OF HABEAS CORPUS**
15                                Respondents.

16

17   **I.      INTRODUCTION**

18          Petitioner Ahmed Ali, a state prisoner represented by counsel, has filed a First

19   Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging

20   his conviction in San Diego County Superior Court Case No. SCD215890 for murder,

21   attempted murder, shooting at an inhabited structure or vehicle, being a felon in

22   possession of a firearm, unlawful possession of a firearm and various firearm and gang

23   enhancements.  (Am. Pet. at 6, ECF No. 1; Lodgment No. 1, vol. 7 at 1586-88.)[1]  The

24   Court has reviewed the Amended Petition, the Answer and Memorandum of Points and

25   Authorities in Support of the Answer, the Traverse, the lodgments, the record, and all the

26   / / /

27

28   ───────────────────────
          [1]  Page numbers for docketed materials cited in this Report and Recommendation refer
     to those imprinted by the Court's electronic case filing system.

1  supporting documents submitted by both parties.  For the reasons discussed below, the

2  Court recommends the Petition be **DENIED**.

3  **II.    FACTUAL BACKGROUND**

4         This Court gives deference to state court findings of fact and presumes them to be

5  correct; Petitioner may rebut the presumption of correctness, but only by clear and

6  convincing evidence.  *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*,

7  506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences

8  properly drawn from these facts, are entitled to statutory presumption of correctness).

9  The following facts are taken from the California Court of Appeal opinion:

10         On the night of July 22, 2008, shootings occurred at two different
       locations in San Diego.

11

12         The first shooting occurred around 9:30 p.m. when two men walked
       up to and shot at a car that was driving out of the Harbor View apartment

13     complex.  The apartment complex was known as a location where members
       of the Neighborhood Crip gang congregated.  One witness described the

14     apartment complex as a "war zone" between the Neighborhood Crip gang
       and the nearby Lincoln Park gang.  Three men were riding in the targeted

15     car, at least two of whom were affiliated with the Neighborhood Crip gang.
       Before shooting at the car, one of the shooters said, "What's up, cuz," with

16     "cuz" being a term that refers to Crip gang members.  Bullets struck the car,
       but no one in the car was shot or seriously injured.  A bullet also entered a
       nearby residence.

17

18         The second shooting, which occurred at an apartment complex on
       College Avenue, was reported to police shortly before 11:00 p.m.  Two men

19     approached a group of people congregating by the stairs at the apartment
       complex and opened fire.  Larry Lumpkin was fatally shot in the head.

20     Maurice McElwee sustained a minor gunshot would to his chest.  Although
       the College Avenue apartment complex was not in any particular gang's

21     territory, it was a common place for members of the O'Farrel Park and
       Skyline Piru gangs to congregate.  Those gangs were rivals of the Lincoln

22     Park gang.  Some of the people fired upon at the College Avenue apartment
       complex were members of the O'Farrell Park or Skyline Piru gangs.

23         On August 7, 2008, the police received information about both
       shootings when a member of the Lincoln Park gang, Jesse Freeman, spoke

24     to police after being arrested on an unrelated offense.  Freeman told police
       that a fellow Lincoln Park gang member, Ali, claimed to have committed

25     both of the July 22, 2008 shootings along with someone named "L" or
       "Lex."  Freeman also gave police information about other crimes, including

26     bank robberies, committed by different Lincoln Park gang members.
       Freeman made similar disclosures to police in subsequent interviews.

27

28         After the disclosure from Freeman, police examined the ballistics
       evidence from the two July 22, 2008 shootings and discovered that the

same firearm was used in both incidents.  Police next searched Ali's apartment and found a shell casing that was shown through forensic analysis to have been discharged from a gun that was fired at both of the July 22, 2008 shooing scenes.

Police arrested Ali in connection with the July 22, 2008 shootings. Freeman testified at a preliminary hearing held on November 14, 2008, describing Ali's admission to committing the shootings.  According to Freeman's testimony, Ali told him that he carried out the shootings to " 'put in some work' " for the Lincoln Park gang and get at members of rival gangs.  Because Freeman was in danger from having testified against a fellow gang member, the police relocated Freeman to Arizona after the preliminary hearing.  Freeman was found dead under a freeway overpass in Arizona on November 22, 2008, having suffered blunt force head trauma. Local police investigation into Freeman's death was inconclusive as to whether the death was a homicide, a suicide or an accident.

Ali was tried for one count of murder based on Lumpkin's death (§ 187, subd. (a)); four counts of attempted murder based on the chest wound to McElwee and the shots fired at the three victims in the car at the Harbor View apartments (§§ 187, subd. (a), 664); two counts of shooting at an inhabited structure or vehicle (§ 246); one count of being a convicted felon in possession of a firearm (former § 12021, subd. (a)(1)); and one count of unlawfully possessing a firearm (former § 12316, subd. (b)(1)). The information also alleged firearm and criminal street gang enhancements (§§ 12022.53, subds. (c), (d), (e)(1), 186.22, subd. (b)(1)).

Because Freeman was no longer alive at the time of trial, his preliminary hearing testimony was read into the record at trial.  The jury also heard recordings of Freeman's interviews with police.

Among the other evidence against Ali at trial was the testimony of two eye witnesses.  First, one of the men who came under fire at the College Ave. apartments on July 22, 2008, testified that he picked Ali out from a photographic lineup in February as one of the shooters, stating that he was 60 to 70 percent certain at the time of the identification.  Second, a teenage boy, James Gomez, who saw the shooters at the College Avenue apartments before they opened fire identified Ali as one of the shooters.

Ali presented testimony from friends and family members, who said they were with Ali at his apartment at the time of the shootings.  Defense counsel argued that instead of Ali committing the shootings, Freeman or some other Lincoln Park gang member could have committed them and could have framed Ali, or the shootings could have been committed by someone associated with different gang.

The jury convicted Ali on all counts, and the trial court sentenced him to prison for an indeterminate term of 135 years to life, plus a determinate term of 60 years.

(Lodgment No. 6 at 3-6.)

/ / /

/ / /

### III.   PROCEDURAL BACKGROUND

On July 14, 2010, the San Diego County District Attorney's Office filed an Amended Information charging Ahmed Ali with one count of murder, a violation of California Penal Code (Penal Code) § 187(a) (count one), four counts of attempted murder, a violation of Penal Code §§ 187(a)/664 (counts two, four, five and six); two counts of shooting at an inhabited structure or vehicle, a violation of Penal Code § 246 (counts three and seven), being a felon in possession of a firearm, a violation of former Penal Code § 12021(a)(1) (count 8); and one count of unlawful possession of a firearm, a violation of former Penal Code § 12316(b)(1).  (Lodgment No. 1 at 12-16.)  The Amended Information also alleged that Ali committed counts one through seven for the benefit of, at the direction of, and in association with a criminal street gang, within the meaning of Penal Code § 186.22(b)(1).  (*Id.*)  In addition, the Amended Information alleged that as to counts one through six, Ali was a principal in the commission of the offense and at least one principal personally used and discharged a firearm, within the meaning of Penal Code § 12022.53(c), (d), and (e)(1).  (*Id.*)  Finally, the Amended Information alleged that the attempted murders charged in counts two, four, five and six were willful, deliberate and premeditated.  (*Id.*)

Following a jury trial, Ali was convicted of all counts and the jury found all the firearm and gang enhancement allegations to be true.  (Lodgment No. 2, vol. 26 at 7519-26.)  He was sentenced to 135 years-to-life plus 60 years in prison.  (Lodgment No. 1, vol. 7 at 1586-87.)

Ali filed a direct appeal of his conviction in the California Court of Appeal, Fourth Appellate District, Division One.  (Lodgment Nos. 3-5.)  The state appellate court affirmed Ali's convictions in an unpublished written opinion.  (Lodgment No. 6.)  Ali then filed a petition for review in the California Supreme Court, which denied the petition without citation of authority.  (Lodgment Nos. 7-8.)

On April 15, 2014, Ali filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court [ECF No. 1].  He filed an amended petition on June 9,

2014, and at that time was represented by counsel [ECF No. 6].  Respondent filed an Answer and Memorandum of Points and Authorities in Support of the Answer on August 7, 2014 [ECF No. 10].  Ali filed a Traverse on August 23, 2014 [ECF No. 11].

## IV.   DISCUSSION

Ali raises twelve claims in his Amended Petition.  First, Ali argues the trial court violated his due process rights when it excluded statements by Marcus House and Hunter Porter. Second, he claims the trial court erred when it refused to instruct the jury on third-party culpability.  In claim three, Ali contends he did not receive a fair trial because of juror misconduct.  Fourth, Ali argues his due process rights were violated when the trial court reviewed evidence in camera, then declined to turn it over to the defense. Fifth, he contends the prosecution failed to turn over exculpatory evidence.  Sixth, he claims his federal constitutional rights were violated when the trial court refused to grant immunity to House and Porter.  Seventh, Ali argues his Sixth Amendment confrontation rights were violated when the trial court permitted the introduction of Jesse Freeman's preliminary hearing testimony.  In claim eight, Ali contends the trial court improperly refused to instruct the jury regarding benefits received by certain witnesses.  Ninth, he claims the prosecutor committed misconduct.  Tenth, Ali argues the trial court incorrectly refused to disclose juror information.  Eleventh, Ali contends the trial court erroneously denied his motion for a new trial.  And finally, in claim twelve, Ali argues the cumulative effect of all the errors at his trial rendered it unfair. (Mem. of P. & A. Supp. Am. Pet. at 1-105, ECF No. 6.)

Respondent argues the state courts' resolution of claims one through eleven was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 15-42, ECF No. 10.)  Respondent also argues claims 10-12 do not state a cognizable federal claim, and claim nine is procedurally defaulted.  (*Id.* at 42-43.)

/ / /

/ / /

A. *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the highest state court the claim was presented to, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst*

*v. Nunnemaker*, 501 U.S. 797, 805-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (*overruled on other grounds by Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  *See Early*, 537 U.S. at 8.  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law.  *Id.*  Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Andrade*, 538 U.S. at 72.

B. *Exclusion of House's and Porter's Statements*

Ali contends in claim one that his federal constitutional right to present a complete defense was violated when the trial court excluded statements made by Marcus House and Hunter Porter.  (Mem. of P. & A. Supp. Am. Pet. at 23-35; Traverse at 3-5.)  Ali wanted House to testify, as House told a defense investigator, that he gave Freeman a nine millimeter handgun before the July 22, 2008 shootings, that Freeman told House he committed the College Avenue shooting with Lamont Edwards, known as "L," and that Freeman described how the shooting took place.  (Lodgment No. 1, vol. 3 at 0540-41.)  Ali wanted Porter to testify to matters bearing on Freeman's credibility.  Porter was being prosecuted for a series of bank robberies.  During a "free talk" with the District Attorney's Office, Porter implicated Freeman in several bank robberies Porter, Freeman and others had committed and said he suspected Freeman had cheated his co-participants out of proceeds from those robberies; Freeman had denied participating in any bank robberies during his conversations with the prosecution about Ali's involvement in the
/ / /

College Avenue and Harbor View shootings. (Lodgment No. 2, vol. 10 at 2439-44, vol. 19 at 5211-15.)

House asserted his Fifth Amendment right against self-incrimination. (Lodgment No. 2, vol. 8 at 2103.)  The trial court ruled the Fifth Amendment did not apply to House's statements, but House refused to testify anyway. (Lodgment No. 2, vol. 11 at 2538.)   Ali then attempted to have House's statements admitted via a defense investigator's testimony; the trial court excluded that testimony. (Lodgment No. 2, vol. 7 at 1943-44.) The trial court excluded Porter's out-of-court statements as well. It found that while Porter's statements regarding his participation in the robberies with Freeman were against his own penal interests, Freeman's statements to Porter were not against Freeman's penal interests. (Lodgment No. 2, vol. 22 at 6412.)  Porter's statements about what Freeman said were therefore simply hearsay and inadmissible. (*Id.*)

Ali raised his claim about the exclusion of House's and Porter's testimony in the petition for review he filed in the California Supreme Court. (Lodgment No. 7.)  That court denied the petition without analysis or citation of authority. (Lodgment No. 8.) Accordingly, this Court must "look through" to the state appellate court's decision denying the claim as the basis of its analysis.  *Ylst*, 501 U.S. at 805-06.  The state appellate court agreed with the trial court's rulings:

> Hearsay is generally inadmissible unless an exception applies. (Evid. Code § 1200).  "The admission of multiple hearsay is permissible where each hearsay level falls within a hearsay exception." (*People v. Williams* (1997) 16 Cal.4th 153, 199, fn. 3, citing Evid. Code § 1201.)[12]
>
> [FN 12:  The statements by House that Ali sought to have admitted contained two levels of hearsay.  At the first level was House's out-of-court statements to the defense investigator.  At the second level was Freeman's out-of-court statements to House that he committed one of the July 22, 2008 shootings.  To the extent Porter recounted Freeman's admission to participating in bank robbery without Porter, that statement is double hearsay.]
>
> Ali argues that the hearsay exception for declarations against penal interest applies to House's and Porter's statements, making them admissible. Under that exception, "[e]vidence of a statement made by a declarant having sufficient knowledge of the subject is not made inadmissable by the hearsay rule if the declarant is *unavailable* as a witness

and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code § 1230, italics added.)

Based on the statute, the first requirement for the application of the declaration against interest exception is the unavailability of the declarant. There is no dispute that the unavailability requirement of Evidence Code section 1230 is met here. House and Porter were both unavailable because they invoked their Fifth Amendment right not to testify. (Evid. Code. § 240, subd. (a)(10).) Further, to the extent that a second level of hearsay involving Freeman's statements is at issue, Freeman was unavailable because he was dead. (*Id.*, § 240, subd. (a)(3).)

Turning to the remaining elements of the declaration against interest exception, the issue in dispute is whether the statements "so far subjected [the speaker] to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

Our Supreme Court has summarized the law applicable to the declaration against penal interest to the hearsay rule. As it explained, " '[t]he proponent of such evidence must show "that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." ' . . . 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration . . . . In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' . . .[I]n this context, assessing trustworthiness "'requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human being actually conduct themselves in the circumstances material under the exception.' " ' " (*People v. Geier* (2007) 41 Cal.4th 555, 584, citations omitted.) "Courts applying [Evidence Code] section 1230 to determine the basic trustworthiness of a proffered declaration are . . . to 'consider all the surrounding circumstances to determine if a reasonable person in [the declarant's] position would have made the statements if they weren't true.' " (*People v. Duarte* (2000) 24 Cal 4th 603, 618 (*Duarte*).)

. . . .

a. *House's Statements*

House's statements to the defense investigator describing Freeman's admission to the July 22, 2008 shooting did not subject House to a risk of civil or criminal liability, as the statements did not implicate House in the shooting. According to the defense investigator, as House described the

situation, he learned about the shooting from Freeman several weeks *after* it happened.

Ali argues that House made a statement against his penal interest because he told the defense investigator that he had given Freeman the gun that was used in the shooting. However, as the trial court reasonably concluded, that statement was not — under the circumstances — so far against House's penal interest that it rendered House's entire statement to the defense investigator sufficiently trustworthy to fall within the hearsay exception. Specifically, House did not state that he gave Freeman a gun with the knowledge that it would be used to commit a specific crime, which might subject House to aider and abettor liability. Further, at the time House made the statement, he was already serving a 20-year prison sentence and was charged with bank robberies. The trial court reasonably concluded that the risk that House might be prosecuted and punished for any crime possibly committed in supplying a firearm to Freeman would not have been significant to House in light of the sentence he was already serving, or faced with serving, for the bank robberies.

In addition, the trustworthiness of House's statement must be viewed in the entire context of the gang-related environment in which it was made. House was a member of the Lincoln Park gang and could be expected to take actions to help other gang members in good standing. Ali was a fellow gang-member, giving House a motive to help him by implicating Freeman, who was a "snitch" against the gang and therefore out of favor. It is reasonable to infer, as did the trial court, that House's statements about Freeman may have been fabricated for the benefit of his fellow gang member Ali, and were therefore not trustworthy enough to qualify for admission as declarations against interest.[13] (*People v. Frierson* (91) 53 Cal.3d 730, 745 ["The court could reasonably find [the witness] wanted to aid his friend at little risk to himself, and thus the statement was insufficiently trustworthy."].)

[FN 13: Because the first level of hearsay — consisting of House's statements — did not qualify for an exception to the hearsay rule as a declaration against House's interest, we need not discuss the second level of hearsay. Further, we note that Ali has argued that House's statement was admissible as evidence of third party culpability. Ali's argument is misplaced. There is no dispute that Freeman's admission to the shooting at the College Avenue apartment complex, if not excluded under the hearsay rule, would be relevant and admissible as evidence of third party culpability. The reason that the evidence was excluded was because it is hearsay, not because it failed to qualify as third party culpability evidence.]

In sum, the trial court did not abuse its discretion in excluding evidence of House's statements to the defense investigator.

### b. *Porter's Statements*

Porter's statements consisted of (1) his description of Freeman taking part in bank robberies, based both on his commission of the robberies with Freeman and Freeman's claim to have committed another robbery; and (2) his description of Freeman having taken more than his share of the proceeds

from a robbery.  The trial court determined that the declaration against interest exception to the hearsay rule did not apply, and it therefore excluded evidence of Porter's statements.

The trial court was within its discretion in excluding Porter's statements.  The statements were made as part of a "free talk" agreement with the district attorney that the statements would *not* be used in the prosecution's case-in-chief in the bank robbery case.  Therefore, the adverse penal consequences to Porter of making the statements were significantly diminished.  Further, the statements could be considered to be insufficiently trustworthy to fall within the declaration against interest exception because Porter was also a Lincoln Park gang member and, like House, had a motivation to help his fellow gang member, Ali, while placing the blame on disfavored gang member Freeman.

Further, even if Porter's statements should have been admitted, their exclusion was not prejudicial.  (See *Duarte*, *supra*, 24 Cal.4th at p. 619 [evaluating whether it is " 'reasonably probable that a result more favorable to defendant would have been reached' " had evidence been admitted under the hearsay exception for a declaration against interest].)  The value to the defense of Porter's statements about Freeman's participation in bank robberies was to call into question Freeman's credibility by showing he lied to authorities when denying involvement in the robberies.  However, the same impeaching evidence was admitted during the trial through another defense witness — Tiano Durham — who testified Freeman committed a bank robbery with him.  Because the excluded evidence was cumulative of other evidence, its admission would not have been reasonably probable to change the outcome of the trial.  Ali also cannot demonstrate prejudice from exclusion of Porter's statement that Freeman took more than his share of the proceed from a bank robbery.  That evidence was not necessary to establish Freeman's disloyalty to fellow gang members as it was clear that Freeman had shown disloyalty to the gang by "snitching" to the police about Ali and the bank robberies.

(Lodgment No. 6 at 21-27.)

Ali first contends that AEDPA deference does not apply to this claim because the state appellate court did not directly address the federal constitutional claim raised by Ali, but rather decided the claim solely on state law grounds.  (Mem. of P. & A. Supp. Am. Pet. at 25-27; Traverse at 2-3.)  "In *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770 [citations omitted] (2011), the Supreme Court held that a reviewing federal court should presume that the last reasoned decision of the state court adjudicated all raised claims on the merits and is entitled to deference pursuant to . . .  AEDPA . . . ."  *Phillips v. Herndon*, 730 F.3d 733, 775 (9th Cir. 2013)  In *Johnson v. Williams*, __ U.S. __, 133 S. Ct. 1088 (2013), the Supreme Court recognized an exception to this rule where "a state court rejects a federal claim without expressly addressing that claim."  *Id.* at 1096.  In

such circumstances, "a federal habeas court must presume that the federal claim was adjudicated on the merits — but that presumption can in some limited circumstances be rebutted." *Id.*

As Respondent points out, the Supreme Court has stated that "if the state-law rule subsumes the federal standard — that is, if it is at least as protective as the federal standard — then the federal claim may be regarded as having been adjudicated on the merits." *Id.*; *see also Phillips*, 730 F.3d at 775. Respondent correctly notes that the Ninth Circuit has concluded that California Evidence Code § 1230 "is at least as protective as the federal standard." *See id.* at 777.

Petitioner argues the presumption has not been rebutted because the state appellate court, in footnote 13 of its opinion, expressly addressed only the state evidentiary law question by stating that "Ali has argued that House's statement was admissible as evidence of third party culpability . . . . There is no dispute that Freeman's admission . . . would be relevant and admissible as evidence of third party culpability." (Mem. of P. & A. Supp. Am. Pet at 25-27; Traverse at 2-3.) Petitioner's argument fails for two reasons. First, footnote 13 does not encompass the totality of the state appellate court's analysis of this claim. Indeed, in both the body of the opinion and the rest of the footnote, it is clear the state court considered the question whether House's statement was admissible hearsay, not just evidence of third party culpability. Second, the cases cited by the appellate court in the body of its opinion clearly indicate the state court considered Ali's federal constitutional claim. *People v. Geier*, 41 Cal. 4th 555, 584 (2007), cited by the state court, cites to *People v. Cudjo*, 6 Cal. 4th 585, 609 (1993) and to *People v. Duarte*, 24 Cal. 4th 603, 614 (2000); both *Cudjo* and *Duarte* discuss the interplay between the Sixth Amendment and rules against the admission of hearsay; *Cudjo* specifically discusses the application of *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), a leading Supreme Court case on this issue. (Lodgment No. 6 at 22-25.) The state court also cited *Duarte*, and *People v. Frierson*, 53 Cal. 3d 730, 745 (1991), which cited *Green v. Georgia*, 442 U.S. 95 (1979), a case regarding whether the exclusion of

a hearsay statement violated a defendant's federal due process rights.  (*Id.* at 25.)  Thus, even though the state appellate court did not expressly resolve the federal constitutional claim presented, its citation of these cases shows the court "understood itself to be deciding a question with federal constitutional dimensions." *Johnson*, 133 S. Ct. at 1098. Accordingly, this Court concludes the last reasoned state court decision, the state appellate court's opinion on direct review, is entitled to AEDPA deference.

Clearly established federal law holds that the right to present evidence and witnesses is essential to due process and is guaranteed by the compulsory process clause of the Sixth Amendment.  *Taylor v. Illinois*, 484 U.S. 400, 409 (1988); *Chambers*, 410 U.S. at 294; *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Dunham v. Deeds*, 954 F.2d 1501, 1503 (9th Cir. 1992).  "The defendant's right to present evidence[, however,]. . . is not absolute," *Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983), and there exists no "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor*, 484 U.S. at 410; *see also Tinsley v. Borg*, 895 F.2d 520 (9th Cir. 1990).  A defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."  *Chambers*, 410 U.S. at 302.  The exclusion of defense evidence is error only if it renders the state proceeding so fundamentally unfair as to violate due process. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Bueno v. Hallahan*, 988 F.2d 86, 87 (9th Cir. 1993).

The Ninth Circuit employs "a balancing test to determine whether the exclusion of evidence in the trial court violated petitioner's due process rights, weighing the importance of the evidence against the state's interest in exclusion."  *Chia v. Cambra*, 360 F.3d 997, 1003. (9th Cir. 2004); *see also Duhaime v. Ducharme*, 200 F.3d 597, 600 (2000) (finding that "[Ninth Circuit] cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law. . . .")  Five factors are to be considered when deciding whether a court's exclusion of defense evidence violates the constitution: "(1) the probative value

of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the defense." *Miller v. Stagner*, 757 F.2d 988, 994-95 (9th Cir. 1985); *Tinsley*, 895 F.2d at 530. The importance of the evidence must then be balanced against the state's interest in exclusion. *Tinsley*, 895 F.2d at 530. To overcome the state's strong interest in the administration of its trials, the circumstances of the exclusion must be "unusually compelling." *Perry*, 713 F.2d at 1452.

### 1. *House's Statements*

According to a defense investigator, House claimed Freeman admitted to committing the College Avenue shooting with another individual, "L," and described how the shooting occurred. (Lodgment No. 1, vol. 2 at 540-41.) House also said he gave Freeman a nine millimeter handgun before the shooting. (*Id.*) House's first two statements were very probative of the central issue of whether Ali or Freeman committed the College Avenue shooting, a main component of Ali's defense. House's third statement was less probative on the issue because while the prosecution's evidence established the gun used at the shooting was a nine millimeter gun, there was no evidence establishing the gun House claims he gave to Freeman with the gun used at the shooting. House's statements were not very reliable, however. As the state court pointed out, House had a strong motive to exonerate Ali, a fellow Lincoln Park gang member in good standing, and incriminate Freeman, a fellow Lincoln Park gang member who became a snitch. And, as the state court thoroughly discussed, House's statements also did not have sufficient indicia of trustworthiness because they were not significantly against his penal interest. House was already serving a significant sentence having been convicted in another case, and his statement about giving the gun to Freeman did not implicate him in the murder since he did not have prior knowledge of Freeman's intent. Moreover, the jury would have had difficulty evaluating House's statements and the possible motivation behind them. Unlike the statements the defendant in *Chambers* sought to admit, House refused to testify after the trial judge determined he could not validly assert

his Fifth Amendment right not to incriminate himself.  Thus, the jury would not have been able to assess House's credibility via live testimony and cross-examination. House's testimony was, however, the sole direct evidence implicating Freeman in the College Avenue murders, which constituted a major part of Ali's defense.

The state's interest in excluding hearsay and properly applying any exceptions to the hearsay rule, however, was also very strong.  As the Court noted in *Chambers*:

> The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury. *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970).  A number of exceptions have developed over the years to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination. Among the most prevalent of these exceptions is the one applicable to declarations against interest — an exception founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made.

*Chambers*, 410 U.S. at 298.

In *Chambers*, the defense sought to introduce evidence that another person, McDonald, had confessed to the crime. *Id.* at 291.  McDonald had confessed to three different people, then recanted.  The trial court excluded the evidence on the ground that it was hearsay and prevented the defense from questioning McDonald as an adverse witness under a state rule preventing counsel from impeaching his own witness. *Id.* at 292.  The Supreme Court concluded that the state court had "mechanistically" applied state evidentiary rules to exclude the evidence, violating Chambers' due process rights. The circumstances of the confession — McDonald had spontaneously confessed to three separate people, other evidence in the case corroborated McDonald's confession, and, most tellingly, McDonald was available for cross-examination — indicated it was sufficiently reliable and should have been admitted. *Id.* at 298-99.

In *Washington v. Texas*, 388 U.S. 14, 19 (1967), Washington tried to call a codefendant, Fuller, who had already been convicted, to testify that Washington had left the murder scene before the fatal shot was fired.  The trial court excluded the testimony because a local rule prevented accomplices from testifying in behalf of each other.  *Perry*, 713 F.3d at 1452 (citing *Washington*, 388 U.S. at 21.)  The Supreme Court found that, on balance, the exclusion violated Washington's due process rights.  *Id.*  The procedural rule excluded an entire class of witnesses because they were ostensibly more likely to lie.  The prosecution, however, used these same witnesses in their cases in chief.  Thus, the Supreme Court found the rule was arbitrary, unfair and did not serve a legitimate state interest.  The defendant's due process rights were therefore violated by the exclusion of the testimony.  *Id.*

Despite a surface similarity to the facts in *Chambers*, House's statements are not the kind of "unusually compelling" evidence contemplated by *Perry* and do not reach the level of reliability that the statements in *Chambers* did.  First, two levels of hearsay were involved in the admission of House's statements.  One level of hearsay was from Freeman to House, and a second level of hearsay was from House to the investigator.  In *Chambers*, only one level of hearsay was involved, and the individuals who allegedly heard McDonald's confessions were subject to cross-examination.  Second, the exclusion of the evidence in Ali's case was not based on a "mechanistic" application of the hearsay rule.  Rather, both the state trial court and the state appellate court carefully analyzed the statements and the circumstances surrounding the statements for indicia of reliability.  Both courts concluded that while Freeman's statement to House was against Freeman's penal interest and therefore may have possessed a level of  trustworthiness, House's statement to the defense investigator was not.  House did not admit to giving Freeman the gun with the knowledge it was to be used in a murder, and House was already serving twenty years in prison for other crimes.  Moreover, House had a motive to help Ali, a Lincoln Park gang member in good standing, as opposed to Freeman, a Lincoln Park

/ / /

gang member who had become a snitch.  As the Ninth Circuit noted in *Perry*, 713 F.2d 1447 (9th Cir. 1983):

> Due process draws a boundary beyond which state rules cannot stray; it does not displace the law of evidence with a constitutional balancing test. State rules are designed not to frustrate justice, but to promote it.  Our common rules of evidence — testimonial privileges, the hearsay rule — have been justified by long experience.  *Chambers*, 410 U.S. at 298, 93 S.Ct. at 1047; *Washington*, 388 U.S. at 24, 87 S.Ct. at 1926 (Harlan, J., concurring).  The state interests which they embody have already been weighed and found to be compelling; only the most urgent considerations, such as those in Chambers, can outweigh them.  A defendant must show that his interest clearly outweighs the state's before we will interfere with routine procedural matters.  *Accord Britton v. Rogers*, 631 F.2d 572, 580 (8th Cir. 1980), cert. denied, 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981).  Thus, a separate consideration of due process will rarely be needed in day-to-day application of the rules of evidence.  Particularly crucial and reliable evidence, such as the excluded confession of *Chambers*, will serve as a warning flag to trial judges to weigh the fairness of their decision.  Evidence of little importance, whether merely cumulative or of little probative value, will almost never outweigh the state interest in efficient judicial process.

*Perry*, 713 F.3d at 1453.

Here, the exclusion of House's statements was a thoughtful and thorough application of state evidentiary laws, and not a rigid or mechanistic application, as Ali claims.

Ali cites *Lunbery v. Hornbeak*, 605 F.3d 754 (9th Cir. 2010) as support for his claim.  (Mem. of P. & A. Supp. Am. Pet. at 28-34; Traverse at 4-5.)  In *Lunbery*, the defendant was charged with the murder of her husband and sought to introduce evidence of a confession by a person who was dead at the time of trial.  *Lunbery*, 605 F.3d at 757.  The house where the murder occurred had been previously occupied by a drug dealer and his ex-wife, Frank Delgado and Cindy Ellis.  Three days after the murder, a confidential informant told law enforcement that he thought the killer had murdered the wrong person, and that the intended victim was Delgado because Delgado had "ripped off several people in town over drug dealings."  *Id.*  Another person interviewed by law enforcement, Oney Rhoades, said he had seen Delgado and Henry Garza "in possession of 'dope' worth $40,000."  *Id.*  In addition, a neighbor saw a car linked to Garza and Delgado in the early morning hours before the murder.  *Id.*  And, about three weeks after the murder, Rory

Keim told law enforcement that Garza, after hearing Keim and others discussing the murder at a pizza parlor, came over to their table and said, "That's a bummer.  My partners blew away the wrong dude." *Id.*  Nine years later, Lunbery was arrested for the murder, and after several hours of interrogation, she confessed.  Garza was dead by the time of trial, and the trial court excluded Keim's testimony about Garza's statement. *Id.* at 758-59.  The Ninth Circuit concluded the exclusion of the evidence of Garza's statement was an unreasonable application of *Chambers*.  *Id.* at 762.

*Lunbery* is distinguishable from the present case.  In *Lunbery*, Garza's statement was made spontaneously three days after the murder.  Garza's involvement in the murder was corroborated by three separate pieces of evidence: a confidential informant's statement to police that he thought the killer the intended victim was Delgado because of Delgado's drug dealing, Rhoades' statement to law enforcement that he seen Delgado and Henry Garza "in possession of 'dope' worth $40,000," and a neighbor who saw a car linked to Garza in the early morning hours before the murder  *Id.*  The evidence corroborating House's statements was not nearly as strong.  According to the defense investigator, House stated he gave Freeman a nine millimeter before the shooting, the same caliber as casings found at the scene. (Lodgment No. 1, vol. 3 at 0623.)  But no evidence establishes the gun House allegedly gave Ali was the same gun used during the shootings.  House also claimed Freeman described the College Avenue apartment complex where the shooting occurred and the location of the victims. (Lodgment No. 1, vol. 3 at 0540-41.)  But House also admitted he was familiar with the College Avenue complex and "had been there on occasion." (*Id.* at 0623-2.)  In addition, Freeman claimed it was House who told Ali to go to the College Avenue complex to shoot rival gang members. (*Id.* at 0619.)  Thus, House could have gained his knowledge of the complex and the location of the shooting from Ali, then told investigators it was Freeman who gave him that information.

As the *Lunbery* court noted, "depending on the facts and circumstances of the case, at times a state's rules of evidence cannot be mechanistically applied and must yield in

favor of due process and the right to a fair trial." *Lunbery*, 605 F.3d at 762.  But the circumstances of Ali's case are not of the quality contemplated by *Chambers* and *Lunbery*.  The state court's determination that House's statements, as testified to by investigators, was not sufficiently reliable or exculpatory was consistent with Supreme Court precedent on this issue.

### 2. *Porter's Statements*

As noted above, Ali sought to admit evidence of Porter's statement to a District Attorney investigator during a "free talk" in which Porter said Freeman lied to law enforcement about not being involved in bank robberies.  (Lodgment No. 2, vol. 19 at 5211.)  Porter also said he believed Freeman had stolen money from "the take," that is, the money stolen during the bank robberies, leaving less for the other participants.  (*Id.*) This evidence, according to Ali, would have impeached Freeman's credibility, calling into question Freeman's statement to police that Ali committed the shootings and, in conjunction with House's statements, supported the defense theory that Freeman, not Ali, was the shooter.  (Mem. of P. & A. Supp. Am. Pet. at 31.)  The trial court excluded Porter's statements, finding that Porter's statements to the investigator were against his own penal interest, but that Freeman's statements to Porter were not against Freeman's interests.  (Lodgment No. 2, vol. 22 at 6412.)

During a hearing on the admissibility of Porter's testimony, defense attorney Funk read an email he had received from the prosecutor.  Porter told district attorney investigator Billy Cahill the following:

> [BY MR. FUNK]: "Between minute 22:00 and 33:00 in the paperwork you guys have, Jesse is lying, saying that he never robbed a bank.  When we rallied up to go, this was my first one.  Jesse said it was his second."  Between minute 36 and 39, talks about the second bank robbery he was involved in and mentions all the players, including Jesse Freeman.  And minute 46, he was asked if he knew that Jesse Freeman was dead.  He stated he'd heard rumors.  Minute 46.25, reference their third bank robbery together, stated Jesse got scared.  Minute 53.45, Freeman contacts him and tells him he wants to talk with him.  Goes over to Freeman's mother's house.  Also present in Tonicka.  Freeman states he wants to be the man now.  He wants to take it out of town.  Minute 59:10, "I believe Jesse stole some money from the take, giving everyone else a smaller cut."  At one

hour 50 seconds, mentions the police report, say[s] the reports are all wrong. And that's it.

(Lodgment No. 2, vol. 19 at 5211.)

As the state court noted, because Porter's statements were part of a "free talk" during which Porter was assured what he said would not be used to prosecute him, they were not sufficiently against Porter's penal interest to support their trustworthiness.  In addition, like House, Porter was a Lincoln Park gang member.  He had an interest in protecting fellow Lincoln Park gang member Ali by pointing the finger at Freeman, an out-of-favor Lincoln Park gang member, who he knew was dead at the time he made the statements.  Porter's statements are nothing like the explicitly exculpatory statements found to be admissible hearsay in *Chambers*, *Washington*, and *Lunbery*.

In any event, even if Porter's statements were wrongly excluded, the error did not had a substantial injurious effect on the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Although the statements would have impeached Freeman's credibility, as the state court noted, the jury already knew Freeman was a Lincoln Park gang member who had committed robberies through the testimony of Tiano Durham, who testified he committed bank robberies with Freeman.  (Lodgment No. 2, vol. 24 at 6974-76.) Freeman also admitted to meeting House at a gas station after House had committed a robbery and looking over the proceeds with House, (Lodgment No. 1, vol. 5 at 1146), and to selling drugs.  (*Id.* at 1147.)  The jury was well aware of Freeman's credibility problems and the reasons why he knew so much about criminal activity.

For the foregoing reasons, the Court concludes that the state court's exclusion of House's and Porter's testimony did not violate Ali's due process rights, and the state appellate court's decision upholding the exclusion was thus neither contrary to, nor an unreasonable application of clearly established Supreme Court law, nor an unreasonable determination of the facts.  *Williams*, 529 U.S. at 412-13; 28 U.S.C. 2254(d)(2).  Ali is not entitled to relief as to this claim.

/ / /

## C. *Third Party Culpability*

Next, Ali argues his due process and fair trial rights were violated when the trial court refused to give jury instructions on third party culpability. (Mem. of P. & A. Supp. Am. Pet. at 36-40; Traverse at 5-7.)  Respondent contends the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 30-33.)

Ali raised this claim in the petition for review he filed in the California Supreme Court. (Lodgement No. 7.)  That court denied the petition without analysis or citation of authority. (Lodgment No. 8.)  Accordingly, this Court must "look through" to the state appellate Court's decision denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06.  That court wrote:

> First, Ali contends that the trial court violated his right to due process and a jury trial when it refused to instruct the jury with a requested pinpoint instruction on third party culpability.

> As the Attorney General acknowledges, there was arguably some evidence of third party culpability presented at trial.  Accordingly, Ali requested the following pinpoint instruction on third party culpability: "You have heard evidence that a person other than the defendant may have committed the offense with which the defendant is charged.  The defendant is not required to prove the other person's guilt beyond a reasonable doubt. Defendant is entitled to an acquittal if the evidence raises a reasonable doubt in your mind as to the defendant's guilt.  However, its weight and significance, if any, are matters for your determination.  If after consideration of this evidence, you have a reasonable doubt that the defendant committed this offense, you must give the defendant the benefit of the doubt and find [him] [her] not guilty."  The trial court denied the instruction.

> On several occasions, our Supreme Court has considered and rejected arguments that a trial court prejudicially erred by not giving a requested pinpoint instruction on third party culpability. (*Hartsch, supra*, 49 Cal.4th at p. 504; *People v. Ledesma*, (2006) 39 Cal.4th 641, 720-721; *People v. Earp* (1999) 20 Cal.4th 826, 887 (*Earp*).)  In those cases, as here, the proposed instruction, would have stressed that the defendant was not required to *prove* third party culpability, and would have informed the jury that the inquiry remained whether the defendant raised a reasonable doubt as to his own guilt. (*Earp*, at p. 887; *Hartsch*, at p. 504.) Those cases were resolved on the basis that if error existed, it was not prejudicial. Third party culpability instructions "add little to the standard instruction on reasonable doubt." (*Hartsch*, at p. 504.) Moreover, "even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's

liability must be considered when weighing whether the prosecution has met it's burden of proof." (*Ibid.*)  "It is hardly a difficult concept for the jury to grasp that acquittal is required if there is a reasonable doubt as to whether someone else committed the charged crimes," especially when as in this case, "[t]he closing argument focused the jury's attention on that point." (*Ibid.*)

Ali argues that his proposed third party culpability instruction was required because "a juror's natural inclination would be to decide whether evidence proved a third party was guilty."  Viewing the entire charge to the jury, however, we find no merit to this argument.  The trial court instructed the jury pursuant to CALCRIM No. 220 that a "defendant in a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise."  The jury could not have understood from the instructions given that Ali was required to prove that someone else committed the crimes.

In light of the fact that the jury was instructed with the standard reasonable doubt instruction in this case, and that defense counsel stressed the concept of third party culpability during closing argument, we find the well-established approach of our Supreme Court to be applicable here.  We therefore conclude that any error in not instructing the jury with Ali's requested third party culpability instruction was harmless.

(Lodgment No. 6 at 27-29.)

"As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  *Mathews v. United States*, 485 U.S. 58, 63 (1988), citing *Stevenson v. United States*, 162 U.S. 313 (1896).  The Ninth Circuit has noted that "[u]nder the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness . . . [which] require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *Bradley v. Duncan*, 315 F.3d 1091, 1098-99 (9th Cir. 2002) (citing *Mathews*, 485 U.S. at 63 and *California v. Trombetta* , 467 U.S. 479, 485 (1984)).  Thus, a "'[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable.'"  *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir. 2006) (quoting *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) (stating that "[a] criminal defendant is entitled to adequate instructions on his or her theory of

defense") (quoting *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976).)   When determining whether error occurred, the Court must consider the jury instructions as a whole.   *Estelle*, 502 U.S. at 72.   Jury instruction error is subject to harmless error analysis, that is, if error is found, relief can only be granted if it had a substantial and injurious effect on the jury's verdict. *California v. Roy*, 519 U.S. 2, 6 (1996); *Brecht*, 507 U.S. at 637.

Ali argues the state court's rejection of his proposed third party liability pinpoint instruction was contrary to *Mathews* because it did not specifically apply *Mathews*' "two-factor standard for determining whether due process requires a defense instruction." (Mem. of P. & A. Supp. Am. Pet. at 39; Traverse at 5-6.)   The Supreme Court has held, however, as follows:

> A state-court decision is "contrary to" our clearly established precedents if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  Avoiding these pitfalls does not require citation of our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.

*Early*, 537 U.S. at 8.

Ali's argument that the state court's decision was "contrary to" clearly established Supreme Court law simply because it does not specifically cite or apply a two-factor test from *Mathews* fails.

Ali's evidence of third party liability was as follows: As to the College Avenue shooting, Canute Dawes testified that in early July of 2008, he got into an argument with some women at the College Avenue apartments over Dawes having a red rag, a Blood color, in his back pocket.  One woman told Dawes the women were Crips and that someone would come back for Dawes. (Lodgment No. 2, vol. 23 at 6617-21.)  The next day, a shooting occurred at the College Avenue apartments.  A second shooting, one of the shootings charged in this case, occurred on July 22, 2008, in which Larry Lumpkin was killed.  (*Id*. at 6621-23.)  Dawes testified he thought the early July and the July 22,

2008 shootings were connected to his altercation with the women. (*Id.* at 6645-48.) During closing argument, the defense argued one of its theories, that members of the Crip gang had committed the July 22, 2008 shooting at the College Avenue apartments. (Lodgment No. 2, vol. 25 at 7330-32.)

As to the Harbor View shooting, Jermaine Simpson testified he saw a person walk up to his brother Arcelon Osborne's car, and say "What's up, cuz?," a typical greeting from one Crip to another. According to Ali, this pointed to a Crip committing the shooting, not a Blood like Ali. Finally, there was evidence presented that Freeman had the opportunity to commit the Harbor View shooting. Freeman was at Ali's apartment on July 22, but, according to Ali's sister Ayan, left the apartment for between 30 minutes to an hour or more; notably, Ayan did not state *when* Freeman was out of the apartment, and indeed stated that he was "in and out" during the day and evening. (Lodgment No. 2, vol. 22 at 6434-35.) Other evidence presented connecting Freeman to the Harbor View shooting was the fact that Freeman sometimes slept in Ali's bed, which could account for the police finding a nine millimeter shell casing under Ali's mattress. (Lodgment No. 2, vol 11 at 2590; vol. 21 at 6170-21; vol. 22 at 6379-80.) During closing, the defense argued Freeman committed the Harbor View shooting. (Lodgment No. 2, vol. 25 at 7313-23.)

The state court's rejection of Ali's third party liability instruction was not an unreasonable application of *Mathews*. In order for a defendant to be entitled to a specific instruction, *Mathews* requires that there be "evidence sufficient for a reasonable jury to find in his favor." *Mathews*, 485 U.S. at 63. The evidence Ali presented to support a third party liability defense was based on speculation. Dawes did not see the July 22, 2008 shooting, and only believed Crips were responsible for the College Avenue shooting because of his own "common sense" related to gang rivalries. Although the victims of the College Avenue shooting stated the shooters said a Crip gang greeting, "What's up, cuz?" shortly before they opened fire, Simpson testified that Crips would not open fire on other Crips, but that sometimes, members of rival gangs will use the greeting, "What's

up, cuz?" so as not to tip the victim off. (Lodgment No. 2, vol. 13 at 3660.) According to Osborne, the shooter said the phrase in an aggressive manner. (*Id.* at 3714.) Gang detective Shane Lynn testified he believed, based on his expertise, that Crips would not fire on Crips. (Lodgment No. 2, vol. 20 at 5438.) As to Freeman, there was no evidence presented, other than speculation, that he committed either shooting. Ali did not present "evidence sufficient for a reasonable jury to find in his favor." *Mathews*, 485 U.S. at 63.

Even if the failure to instruct the jury with the pinpoint instruction was error, however, its omission did not have a substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 637. The reasonable doubt instruction, combined with the eyewitness identification instruction adequately informed the jury that they were to find Ali guilty of the crimes charged only if they concluded, beyond a reasonable doubt, that it was Ali who had committed those crimes. (Lodgment No. 1, vol. 4 at 0883, 0895.) In addition, CALCRIM No. 373 instructed the jury that "[t]he evidence shows that another person may have been involved in the commission of the crime[s] charged against the defendant," and that their "duty was to decide whether the defendant on trial here committed the crimes charged." (*Id.* at 0907.)

Ali contends that affidavits submitted by two jurors indicate that, had the pinpoint instruction been given, those jurors would not have voted to convict Ali. (Mem. of P. & A. Supp. Am. Pet. at 40-41; Traverse at 6-7.) Assuming those affidavits can be considered by the Court, they do not show the failure to instruct with the pinpoint instruction had a substantial and injurious effect on the jury's verdict. The proposed instruction read as follows:

> You have heard evidence that a person other than the defendant may have committed the offense with which the defendant is charged. The defendant is not required to prove the other person's guilty beyond a reasonable doubt. Defendant is entitled to an acquittal if the evidence raises a reasonable doubt in your minds as to the defendant's guilt. Such evidence may by itself raise a reasonable doubt as to the defendant's guilt. However, its weight and significance, if any, are matters for your determination. If after consideration of this evidence, you have a
>
> reasonable doubt that the defendant committed this offense, you must give the defendant the benefit of the doubt and find [him] [her] not guilty.

(Lodgment No. 1, vol. 4 at 0875.)

The reasonable doubt instruction mirrored this instruction, informing the jurors that Ali was presumed innocent and they needed to find he was guilty beyond a reasonable doubt:

> The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he was arrested, charged with a crime, or brought to trial.
>
> A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt [unless I specifically tell you otherwise].
>
> Proof beyond a reasonable doubt is proof that leave you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.
>
> In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

(*Id.* at 0883.)

In her affidavit, Juror No. 1 stated that she "felt Mr. Ali was innocent, but did not see the evidence to prove it," and that other jurors were "adamant that we could only consider the evidence in front of us, and that it pointed to guilt." Juror No. 2 stated that he believed he could "only consider the evidence that was presented to me which pointed to Mr. Ali's guilt," and that he was "unaware that I could find Mr. Ali not guilty without having a reason to justify my decision." Both jurors' affidavits suggest difficulties with an understanding of reasonable doubt, not third party liability. Moreover, both the proposed and given instructions told the jury that the burden of proof was on the prosecution to prove Ali was guilty beyond a reasonable doubt. (*Compare* proposed instruction, "The defendant is not required to prove the other person's guilt beyond a reasonable doubt. Defendant is entitled to an acquittal if the evidence raises a reasonable doubt in your minds as to the defendant's guilt," *with* given instruction "A defendant in

a criminal case is presumed to be innocent.  This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.")  Both instructions told jurors to consider all of the evidence in determining guilt.  (*Compare* proposed instruction, "[Evidence another person committed the crimes] may by itself raise a reasonable doubt as to the defendant's guilt.  However, its weight and significance, if any, are matters for your determination.  If after consideration of this evidence, you have a reasonable doubt that the defendant committed this offense, you must give the defendant the benefit of the doubt and find [him] [her] not guilty," *with* given instruction "[Y]ou must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.")

Given the above, the Court concludes the refusal to give the proposed instruction did not have a substantial and injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 637.  The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, nor was it based on an unreasonable determination of the facts.  *Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254(d)(2).  Ali is not entitled to relief as to this claim.

D. *Juror Misconduct and Admissibility of Juror Affidavits*

In claim three, Ali argues his Sixth and Fourteenth Amendment rights were violated by jurors' misconduct, and the state court should have permitted jurors' affidavits regarding juror deliberations to be considered as part of this inquiry.  (Mem. of P. & A. Supp. Am. Pet. at 41-50; Traverse at 7-10.)   Respondent contends the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 35-42.)

Ali raised this claim in the petition for review he filed in the California Supreme Court.  (Lodgement No. 7.)  That court denied the petition without analysis or citation of authority.  (Lodgment No. 8.)  Accordingly, this Court must "look through" to the state appellate court's decision denying the claim as the basis for its analysis.  *Ylst*, 501 U.S.

at 805-06.  That court wrote:

> In support of his juror misconduct claim, Ali submitted a new declaration from Juror No. 1, similar to the declaration we have already discussed above, along with declarations from Juror No. 2 and Juror No. 5.[FN 18]

> [FN 18: Ali also submitted a declaration from the defense investigator, who described statements made by Juror No. 9 when talking to defense counsel after the verdict.  According to the defense investigator, Juror No. 9 stated that, due to the wounds on Freeman's hands, he was unsure whether Freeman committed suicide.  The totality of the statement by Juror No. 9 — as described by the defense investigator — constitutes hearsay and was accordingly not admissible in connection with the motion for a new trial.  (*People v. Williams* (1988) 45 Cal.3d 1268, 1318 ["It is settled . . . that 'a jury verdict may not be impeached by hearsay affidavits.'"].)  Moreover, to the extent Juror No. 9 was describing his thought process during jury deliberations, that statement is inadmissible under Evidence Code section 1150.]

> Juror No. 2's declaration made three points: (1) he was "unaware that [he] could find [Ali] not guilty without have a reason to justify [his] decision"; (2) he felt time pressure to finish deliberating because some of the jurors would have to be replaced by alternates if deliberations continued into the next week; and (3) two jurors were "pressured" into voting guilty by other jurors who "no longer had the patience to deliberate."

> Juror No. 5 stated: (1) Juror No. 6 seemed "sleepy" and "dazed" and seemed to not be paying attention during the trial; (2) at the beginning of deliberations Juror No. 6 said he was voting guilty because the District Attorney knew what he was doing, and "if [the District Attorney] had enough evidence to say he was guilty, then he must be guilty," and then Juror No. 6 didn't say anything else during deliberations; and (3) jurors felt under time pressure because if deliberations continued into the next week, deliberations would have to start over with alternates.

> Juror No. 1's declaration was similar to the declaration filed to support the motion for release of juror information.  Juror No. 1 stated: (1) she felt Ali was innocent "but did not see the evidence to prove it"; (2) she felt time pressure because if deliberations continued into the next week, alternates would have to be called in; (3) eight jurors seemed to have their minds made up at the beginning of deliberations although "[t]hey discussed other possibilities"; (4) Juror No. 4 was "scoffed at" by other jurors when he carefully reviewed the telephone records; and (5) two jurors had a conversation, with one describing Freeman as a " 'lazy loser,' " and the other saying " 'Aren't they all,' " which Juror No. 1 took to refer either to Black men or gang members.

> The trial court denied the motion for a new trial based on juror misconduct.  As in connection with the motion to release juror information, the trial court explained that many of Ali's juror misconduct allegations were based on evidence made inadmissible by Evidence Code 1150, and that the admissible evidence did not establish juror misconduct.  Ali contends the trial court erred.

In evaluating a motion for a new trial based on juror misconduct, "[t]he trial court must undertake a three-step process . . . . The trial court must first 'determine whether the affidavits supporting the motion are admissible. (Evid. Code, § 1150.)' . . . [¶] Second, 'If the evidence is admissible, the trial court must determine whether the facts establish misconduct. . . .' . . . [¶] ' "Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial.' " (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345, citations omitted.) " 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.] ' " "A trial court's ruling on a motion for a new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' " (*People v. Thompson* (2010) 49 Cal.4th 79, 140 (*Thompson*).)

Applying the first step of the analysis, we agree with the trial court that many of the statements in the three jurors' declarations submitted in support of the new trial motion were inadmissible under Evidence Code section 1150. First, all three declarations describe the feeling of being under time pressure to reach a verdict because of impatience from other jurors or because alternates would have to be substituted if deliberations carried on in the next week. Those statements plainly describe the jurors' mental state during deliberations and are inadmissible under Evidence Code section 1150. (*Cox, supra*, 53 Cal.3d at p. 695 [statements regarding the effect on some jurors from complaints about slow pace of deliberations is inadmissible under Evid. Code, § 1150].) Second, Juror No. 5's and Juror No. 1's statements suggesting that they wanted to find Ali not guilty but did not do so because they couldn't support the verdict with evidence is clearly a description of their thought processes. Third, the statement by Juror No. 6 — as reported by Juror No. 5 — that he was voting guilty because the District Attorney knew what he was doing, is a statement of the mental process by which Juror No. 6 reached a verdict, and is not admissible. Therefore, the trial court properly excluded these statements from its consideration of the new trial motion. (See *Steele, supra*, 27 Cal.4th at p. 1264 ["The trial court correctly refused to consider evidence of the jurors' subjective thought processes. Accordingly, did not abuse its discretion in denying the new trial motion to the extent it was based on this evidence."].)

The remaining issue is whether the trial court was within its discretion to determine that the *admissible* evidence in the three jurors' declarations was insufficient to establish juror misconduct for the purpose of the motion for a new trial.

The first admissible evidence we consider is the possible racially-directed comments from Juror No.1 heard from two other jurors (i.e., Freeman was a " 'lazy loser,' " with the response " 'Aren't they all.' "). As the trial court correctly pointed out, Juror No. 1's interpretation that her fellow jurors harbored racial bias was speculative and subjective. The

statements she described were ambiguous, and she admitted in her declaration that the comments could have been referring to the gang members with whom Ali associated rather than constituting racially-biased comments. Further, as we have explained, even if the comments were directed at Freeman's race, there is no indication that the racial stereotypes entered into any prejudgment of Ali's guilt. Therefore, we agree with the

trial court that no juror misconduct was established by the portion of Juror No. 1's declaration describing possible racially-biased comments.

Next, we consider whether Juror No. 5's description of Juror No. 6's inattention during trial established misconduct. Although our Supreme Court has held that *extreme* inattentiveness during trial will constitute misconduct, it has recognized that "[e]ven the most diligent juror may reach the end of his attention span at some point during a trial and allow his mind to wander temporarily from the matter at hand." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 418.) Thus only inattentiveness rising to the level of actually sleeping during trial or diverting one's complete attention by activities such as reading a novel or doing crossword puzzles constitutes misconduct. (*Id.* at pp. 411-412 [holding crossword puzzle working and novel reading constituted misconduct and observing that, in general, cases "decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during material portions of the trial."].) Here, the inattentiveness described by Juror No. 5 did not rise to that level. Moreover, the trial court expressly stated that it had closely watched the jurors during the trial, and it had observed nothing except normal periodic wandering of attention in Juror No. 6's demeanor. Accordingly, the trial court was well within its discretion to deny the portion of the new trial motion premised on supposed juror inattention.

Finally, we consider the statement by Juror No. 1 and Juror No. 5 that some of the other jurors refused to engage in meaningful deliberations because they made up their minds at the beginning of the discussion. A perception by one juror that another juror has refused to deliberate will establish juror misconduct only if there has been an "objective failure to deliberate, such as jurors who turned their backs or otherwise objectively segregated themselves from deliberations." (*Thompson, supra,* 49 Cal.4th at p. 141.) That is not what is described in the declarations. On the contrary, Juror No. 5's comments about what Juror No. 6 said during deliberations shows that he *was* participating in the deliberative process by stating the reasons for his views. Further, although Juror No. 1 claimed that other jurors had already made up their minds at the beginning of deliberations, she also stated that they "discussed other possibilities with us" and discussed that they believed the evidence "pointed to guilt." Those comments show that the other jurors *did* participate in the deliberations.[FN19]

[FN 19: It is unclear what sort of misconduct Juror No. 1 meant to indicate by stating that other jurors "scoffed" when Juror No. 4 went carefully through the telephone records. If the incident is supposed to show a failure to deliberate, it does not succeed in doing so and instead demonstrates a dialogue and expression of opinion between jurors during deliberations.]

In sum, the trial court was well within its discretion to conclude that much of the jurors' statements supporting the motion for a new trial were inadmissible and that the balance of the statements did not establish misconduct. The trial court thus did not abuse its discretion in denying the motion for a new trial.

(Lodgment No. 6 at 44-49.)

The first question this Court must answer is what evidence it can consider in determining whether juror misconduct occurred. Ali contends the juror affidavits were admissible under Federal Rule of Evidence 606(b) because they do not concern the jury's mental processes, statements made, or incidents which occurred during deliberations, or the effect of any such statements or incidents on an individual juror's mental process. *See* Fed.R. Evid. 606(b).[2] Consistent with Rule 606(b), clearly established Supreme Court law states that, except for "extraneous influences," juror testimony that impeaches a verdict is "flatly prohibited." *Tanner v. United States*, 483 U.S. 107, 117 (1987). Excluded evidence, evidence extrinsic to the trial, and other outside influences such as threats and bribes have been found to be "extraneous influences." *Mattox v. United States*, 146 U.S. 140, 148-53 (1892); *United States v. Henley*, 238 F.3d 1111, 1115-18 (9th Cir. 2001). By contrast, recounting personal experiences, discussions of the defendant's failure to testify, jurors' ability to see and comprehend evidence, and allegations that jurors were under the influence or incompetent are considered internal processes and are not to be considered by a court faced with a motion for a new trial due to juror misconduct. *Tanner*, 483 U.S. at 120-21. The Court will consider each of the statements made by the jurors in their affidavits for admissibility.

1. *Statements About Feeling Pressure to Reach a Verdict*

Juror Nos. 1 and 2 stated in their affidavits that they and other jurors felt "pressured" and "compelled" to reach a verdict because other jurors had vacations scheduled and the jury would have to begin deliberations over if alternates were substituted. (Lodgment No. 1, vol. 4 at 1000, 1003-04.) Juror No. 5 stated that two other jurors, who were undecided, were told by another juror that if they did not reach a verdict that day, he would not return on Monday and the jury would have to start over. (*Id.* at 0998.) Juror No. 5 also stated that Juror No. 7 "paced behind the two undecided jurors, sighing and giving them impatient looks." (*Id.*)

---

[2] Federal Rule of Evidence 606(b) applies to federal habeas proceedings. *See Capps v. Sullivan*, 921 F.2d 260, 262 (10th Cir. 1990).

The state court's conclusion that these statements described the jurors' internal thought processes and mental state during deliberations was not unreasonable. *See Warger v. Shauers*, __ U.S. __, 135 S. Ct. 521, 529-30 (2014). Descriptions of how jurors felt about the deliberation process, statements made by jurors and jurors' reactions to those statements, as the state court noted, "plainly describe the jurors' mental state during deliberations," and as such are inadmissible under federal law. *Id.* at 530, citing *Tanner*, 483 U.S. at 118; *United States v. Rutherford*, 371 F.3d 634, 640 (9th Cir. 2004); Fed.R.Evid. 606(b). Thus, they are inadmissible.

### 2. *Statements About the Burden of Proof and Weight of the Evidence*

Next are statements made by Juror Nos. 1 and 2 about their decision to find Ali guilty. Juror No. 1 stated that "[a]t the time of the verdict, [she] felt Mr. Ali was innocent, but did not see the evidence to prove it." (Lodgment No. 1, vol. 4 at 1000). She also stated that she "was not left with an abiding conviction that Mr. Ali was guilty," and that she believed both the trial and the deliberations were "unfair." (*Id.*) Juror No. 2 stated that at the time of deliberations, "[he] believed . . . that [he] could only consider the evidence that was presented to me which pointed to Mr. Ali's guilt," and that he was "unaware that [he] could find Mr. Ali not guilty without having a reason to justify my decision." (*Id.* at 1003.) Again, as the state court concluded these statements were "clearly a description of [the jurors'] thought processes," i.e., how they interpreted and applied the instructions to Ali's case, their assessment of the evidence, and the process by which they arrived at their decision. *See*, *e.g.*, *Rutherford*, 371 F.3d at 640 (holding that jury's consideration of defendant's failure to testify is inadmissible evidence of internal thought process of the jury). They, too, are inadmissible. *Warger*, 135 S. Ct. at 529-30; *Tanner*, 483 U.S. at 118; Fed.R.Evid. 606(b).

### 3. *Statement by Juror No. 1 about Juror No. 4 Reviewing Phone Records*

Juror No. 1 asserted in her affidavit that "Juror 4, Justin, went through the phone records carefully, and some of the others scoffed at him, asking why he would bother doing that." (Lodgment No. 1, vol. 4 at 1001.) The state court's determination that this,

too, was evidence only of the internal influences and thought processes of the jurors during deliberations was reasonable.   Similar to the allegations that jurors were "pressured" or "compelled" to reach a verdict by fellow jurors' statements regarding vacations and the substitution of alternate jurors, these allegations describe Juror No. 1's perceptions of fellow jurors' thoughts about and approaches to the evidence and their roles as jurors, and their consideration is thus prohibited by state and federal law. *Warger*, 135 U.S. at 529-30; *Tanner*, 483 U.S. at 118; Fed.R.Evid. 606(b).

### 4. *Statement by Juror No. 6 About the District Attorney*

Juror No. 5 alleged in his affidavit that Juror No. 6 told fellow jurors as deliberations began that he was "voting for guilt . . . [because] he figured the District Attorney knew what he was doing, and that if he had enough evidence to say he was guilty, then he must be guilty."  (Lodgment No. 1, vol. 4 at 0997.)  The state court reasonably concluded this evidence was "a statement of the mental process by which Juror No. 6 reached a verdict, and is not admissible." (Lodgment No. 6 at 47.)  As with the preceding evidence, the statement concerns the internal thought process by which Juror No. 6 considered the evidence, applied the law, and rendered his verdict.

### 5. *Statements About Jurors Refusing to Deliberate*

Juror No. 5 alleged in his affidavit that Juror No. 6 began deliberations by stating he was voting for guilt because the District Attorney must know what he was doing; Juror No. 5 stated Juror No. 6 "never said another word."  (Lodgment No. 1, vol. 4 at 0998.) Juror No. 1 alleged in her affidavit the following: "Eight out of the twelve jurors began deliberations with their minds already made up.  They said Mr. Ali was guilty.  They discussed other possibilities with us, but were adamant the we could only consider the evidence in front of us, and that it pointed to guilt."  (*Id.* at 1001.)

A refusal to deliberate can constitute misconduct.  *See Williams v. Cavazos*, 646 F.3d 626, 648 (9th Cir. 2011), *reversed on other grounds by Johnson*, 133 S. Ct. 1088 (2013); *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006).  This Court agrees, however, with the state court's conclusion that statements made by Juror Nos. 1 and 5 do

not establish that other jurors refused to deliberate.  Juror No. 5's allegation that Juror No. 6 "never said another word" after stating that he was voting guilty because the District Attorney knew what he was doing presupposes Juror No. 6 ignored the discussions other jurors were having about the evidence and the effect those discussions may have had on his internal decision making and thought processes.  In addition, Juror No. 1's allegations, as the state court noted, showed that the "eight out of twelve jurors" she referred to were in fact deliberating by "discussing other possibilities" than guilt, while at the same time insisting (correctly) that the jury was only to consider the evidence in front of them, and, finally, concluding that the evidence presented had convinced them of Ali's guilt.

6. *Statements About Inattentive Juror*

Juror No. 5 stated in his affidavit that Juror No. 6 "was not paying attention," at times "seemed sleepy," and "had a dazed look like he was thinking about other things." (Lodgment No. 1, vol. 4 at 0097.)  According to Juror No. 5, Juror No. 6 told him he wasn't paying attention during the trial.  (*Id.*)  The state court found this evidence to be admissible, presumably because it did not concern statements or mental processes during deliberations, but rather during the presentation of evidence.  (Lodgment No. 6 at 48.)

The state appellate court noted that under California law, "only inattentiveness rising to the level of actually sleeping during trial or diverting one's complete attention by activities such as reading a novel or doing crossword puzzles constitutes misconduct." (Lodgment No. 6 at 48.)  There is no clearly established Supreme Court law, however, that states inattentiveness during testimony establishes juror misconduct.  Indeed, cases suggest the opposite conclusion.  *See Warger*, 135 S. Ct. at 529-30; *Tanner*, 483 U.S. at 125-26 (stating that, assuming Rule 606(b)  permitted a "post-verdict inquiry of juror incompetence," a showing by defendant that "several of the jurors fell asleep at times during the afternoons" was insufficient to establish juror incompetency); *United States v. Zepeda*, 506 Fed. Appx. 536 at *2 (9th Cir. 2013) (stating that "Zepeda failed to demonstrate that the juror's inattention 'deprived him of his right to an impartial jury, and

more generally, to a fair trial' because the record reflects that the juror was asleep during key testimony that incriminated him"); *United States v. Olano*, 62 F.3d 1180, 1189 (9th Cir. 1995) (stating that "the presence of a sleeping juror during trial does not, per se, deprive a defendant of a fair trial). In addition, as the state court noted, the trial judge make explicit factual findings regarding Juror No. 5's allegations and the attentiveness of the jury:

> [THE COURT]: First of all, I watch the jurors during the trial. I spend, in fact, the vast majority of my time either reading the live-note or watching the jurors. The reason I do that is it is not uncommon for jurors, particularly elderly jurors, to sometimes doze off. And there are various ways I deal with that. Oftentimes, I'll have another juror poke them so I avoid any type of embarrassment to them. That never happened here. I did not see Juror No. 6 dozing or not paying attention.
>
> Like all jurors, like everybody, at different times depending on where we were in the evidence, he was looking around the room. Attorneys do that. Everybody does that. But I certainly didn't see him quote/unquote not paying attention.

(Lodgment No. 2, vol. 28 at 8117-18.)

Given the state of federal law, the factual findings made by the trial court, and the deference this Court must afford the state appellate court's decision, the Court concludes the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, nor was it an unreasonable determination of the facts. *Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254(d)(2).

7. *Statements About Racial Bias*

The most troubling allegation of misconduct was Juror No. 1's claim that two jurors made potentially racist comments during deliberations. Juror No. 1 alleged in her affidavit the following:

> There was racism involved in our deliberations. In addition to the fact that all 8 of those who voted immediately for guilt were white males,
>
> I heard one of them describe Jesse Freeman as a "lazy loser." Another of them responded, "Aren't they all?" I took that to mean he meant black men or gang members, including the defendant.

(Lodgment No. 1, vol. 4 at 1001.)

Ali cites *United States v. Henley*, 238 F.3d 1111 (9th Cir. 2001) as support for his

contention that Rule 606(b) does not apply to statements made by jurors during deliberations that illustrate racial bias. (Mem. of P. & A. Supp. Am. Pet. at 31-34.)  In *Henley*, a former juror who had been excused from the jury, Michael Malachowski, told the court after trial that one of the jurors, Sean O'Reilly, had made racist statements while carpooling and from trial, including the statement, "All the niggers should hang." *Henley*, 238 F.3d at 1112-13.  Malachowski also alleged a juror, Brian Quihuis, had tried to extort money from the defendant, Henley, in exchange for a not guilty vote. *Id.* at 1113.  An investigation was begun, revealing that Malachowski, not Quihuis, had initiated an ultimately unsuccessful bribery attempt of Quihuis. *Id.*  An evidentiary hearing was held regarding the juror misconduct allegations, which included drug use by Quihuis and discussions of the evidence before deliberations began by Quihuis, O'Reilly, and Malachowski. *Id.*  Evidence at the hearing was contradictory regarding the racist remarks allegedly make by O'Reilly. *Id.* at 1113-14.

Defendants ultimately contended they were denied a fair trial because the jury was tainted by racial bias which they claimed was an "extraneous influence" not prohibited by Rule 606(b) from consideration, or, in the alternative, that they were denied a fair trial because O'Reilly lied during voir dire about his racist beliefs. *Id*. at 1119.  The Ninth Circuit conceded that "a powerful case can be made that Rule 606(b) is wholly inapplicable to racial bias because, as the Supreme Court has explained, '[a] juror may testify concerning any mental bias in matters *unrelated to the specific issues that the juror was called upon to decide. . . .*' [citations omitted]." *Id.* at 1120.  The Court further stated that "[i]t would seem, therefore, to be consistent with the text of the rule, as well as with the broad goal of eliminating racial prejudice from the judicial system, to hold that evidence of racial bias is generally not subject to Rule 606(b)'s prohibitions against juror testimony." *Id.*  The Court ultimately concluded, however, that they "need not decide today whether or to what extent the rule prohibits juror testimony concerning racist statements made during deliberations or, as in this case, outside of deliberations, but during the course of the trial." *Id.* at 1121.  The Court rested its decision to remand the

case for further evidentiary proceedings on the ground that the evidence suggested O'Reilly had lied during voir dire about his racist beliefs, and, had those beliefs been known, he would have been challenged for cause and would not have served on the jury. *Id.* at 1121.

The Supreme Court's decision in *Warger* seriously undermines, if not totally abrogates, *Henley*. Moreover, even if this Court were to apply the logic of *Henley* and find that Rule 606(b) does not prevent this Court from considering the "racially tinged" statements, the state court's decision that this did not constitute juror misconduct was not unreasonable. Juror No. 1's statement that "[t]here was racism involved in our deliberations," was, as the state court found, speculative. It was Juror No. 1's personal perspective that "[i]t was not a coincidence that the [eight jurors who initially said Ali was guilty] were all white males." The statement that Freeman was a "lazy loser," and the other juror's response, "Aren't they all?" is troubling. It is not clear if the "they" in the statement refers to gang members, black men, or both, and thus it is not clear whether the juror harbored any racial animus. Given the Supreme Court's recent decision in *Warger*, and the deference this Court must afford the state court's decision, however, the Court cannot conclude it was unreasonable for the state court to find no juror misconduct. *Williams*, 529 U.S. at 412-13.

Finally, Ali cites *Irwin v. Dowd*, 366 U.S. 717 (1961) as support for his contention that Ali did not receive a fair trial. (Mem. of P. & A. Supp. Am. Pet. at 41-43; Traverse at 9-10.) *Irwin* involved a case in which a massive amount of pre-trial publicity tainted the jury pool and the eventual jury members. *Irwin* stands for the very broad proposition the Constitution guarantees "the right to a fair trial by a panel of impartial, 'indifferent' jurors." *Id.* at 722. In *Irwin*, the pretrial publicity was so extensive and biased against the defendant that the individuals who where eventually selected for the jury were so prejudiced against the defendant, who ultimately received the death penalty, that "[e]ight out of the 12 thought petitioner was guilty" before deliberations even began. *Id.* at 727. The Supreme Court stated that "[w]here one's life is at stake — and accounting for the

frailties of human nature — we can only say in the light of the circumstances here the finding of impartiality does not meet constitutional standards." *Id.* at 728.

The broad strokes of *Irwin* do not compel the conclusion that the jury in Ali's case was impartial or that the verdicts were not based on the evidence presented. Indeed, the facts and circumstances of *Irwin* and Ali's case are not alike. There is no evidence in the record establishing extensive pretrial publicity that tainted the jury pool or the jury itself, as in *Irwin*. Rather, Ali asks this Court to explore the motivations and reasons jurors had for rendering their verdicts. This is not permitted. Moreover, Ali's claim that his trial violated *Irwin*'s requirement that a verdict must be based only on "the evidence presented at trial" fails. *Irwin*'s pronouncement was made within the context of a jury pool so compromised by pretrial publicity that it amounted to an external influence on the jury. Here, no such external influences were present. Accordingly, the state court's denial of the claim was not an unreasonable application of *Irwin*.

### 8. *Unreasonable Determination of the Facts*

Ali also argues the state court's decision was based on an unreasonable determination of the facts because the state court's conclusion that Juror No. 6 was deliberating despite his admission he believed Ali "must be guilty" because "the District Attorney knew what he was doing" was objectively unreasonable. (Mem. of P. & A. Supp. Am. Pet at 36-37.) Juror No. 6 allegedly stated that he was voting for guilt *because* the District Attorney knew what he was doing and if the District Attorney had enough evidence to say Ali was guilty, then he was guilty. As the state court concluded, Juror No. 6 gave his reasons for his views, and the deliberative process he used to arrive at his conclusion. Given the deference this Court must afford the state court's decision, it was not objectively unreasonable to so conclude.

For the foregoing reasons, the Court finds that the state court's resolution of Ali's juror misconduct claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13; 29 U.S.C. § 2254(d)(1). Nor was it based on an unreasonable determination of the facts in light of

the evidence presented.  28 U.S.C. § 2254(d)(2).  Accordingly, Ali is not entitled to relief as to this claim.

### E.  *In Camera Review of Documents*

Ali next claims his due process rights were violated by the state court's *in camera* review of police personnel records pursuant to the state procedure outlined in *Pitchess v. Superior Court*, 11 Cal. 3d 531 (1974) and the withholding of information pursuant to the "official information" exception of California Evidence Code § 1040.  (Mem. of P. & A. Supp. Am. Pet. at 50-51.)  Respondent contends the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 15-16.)

*Pitchess* provides a mechanism by which California defendants are permitted access to information contained in an officer's personnel file if that information is "pertinent to the defense."  *Eulloqui v. Superior Court*, 181 Cal. App. 4th 1055, 1064 (2010).  Once a sufficient showing has been made, the officer's personnel file is reviewed *in camera* by the trial judge who makes a determination as to whether there is any pertinent, discoverable information in the file.  *Id.*  California Evidence Code § 1040 permits the District Attorney's office to withhold certain confidential information if the need for confidentiality outweighs the need for disclosure.  Evid. Code § 1040.  Information such as the identity of a confidential informant is a typical subject of request to disclose or an assertion of privilege under § 1040.  *See People v. Acevedo*, 209 Cal. App. 4th 1040, 1053 (2012).  A similar *in camera* proceeding is employed.  Evidence Code § 1042(d).  The state appellate court concluded the trial court conducted the appropriate *in camera* proceedings and its decisions regarding the confidential information in the police personnel files and other documents were correct.  The court wrote:

> Prior to trial, Ali made motions for discovery of information in the personnel files of (1) San Diego Police Detective Duane Malinowski; and (2) San Diego District Attorney Investigator Shane Lynn.  Malinowski was the arresting officer on Ali's case, and Lynn was heavily involved in investigating the shootings for which Ali was convicted.  Specifically, Ali sought evidence from Malinowski's and Lynn's personnel files,

encompassing — among other things — evidence of dishonesty and excessive use of force or aggression.  The trial court determined that evidence showing a pattern harassing gang members as to Malinowski and allegations of fabrication of evidence and threatening witnesses as to Lynn would be relevant in this case.

The trial court reviewed the relevant personnel records in camera for the purpose of determining whether they contained such items and found no discoverable material.  On appeal, Ali requests that we review the personnel records provided to the trial court in camera to determine whether the trial court abused its discretion in determining that no information from Malinowski and Lynn's records should be provided.  The Attorney General does not oppose this request.

A defendant is entitled to discovery of a law enforcement officers' confidential personnel records if those files contain information that is potentially relevant to the defense. (*Pitchess v. Superior Court* (1974) 11 Cal.3d 537-583; Evid. Code, §§ 1043-1045.) The discovery procedure has two steps.  First, the defendant must file a motion seeking such records, containing affidavits "showing good cause for the discovery or disclosure sought [and] setting forth the materiality thereof to the subject matter involved in the pending litigation." (Evid. Code, § 1043, subd. (b)(3).) If good cause is shown, the trial court then reviews the records in camera to determine whether any of them are relevant to the intended defense. (*Id.*, § 1045, subd. (b).) A trial court's decision on the discoverability of material in police personnel files is reviewable under an abuse of discretion standard. (*People v. Breaux* (1991) 1 Cal.4th 281, 311-312.)

Following established procedure, "the records have been made part of the record on appeal but have been sealed, and appellate counsel for defendant have not been permitted to view them." (*People v. Hughes* (2002) 27 Cal.4th 287, 330; see also *People v. Mooc* (2001) 26 Cal.4th 1216, 1232.)  We have independently examined the personnel files in camera.  Based on that review, we conclude that the trial court did not abuse its discretion in refusing to disclose any further information from those files.

. . . .

Ali also requests that we review sealed records to determine whether the trial court abused its discretion in determining that good cause had been shown for the prosecution to withhold confidential information in discovery.

We begin with the applicable statutory background.  Under section 1054.7, the prosecution is required to provide discovery to the defense as described in section 1054.1, "unless good cause is shown why a disclosure should be denied, restricted, or deferred." (§ 1054.7.)  Good cause is statutorily limited to "threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement." (*Ibid.*)  Similarly, under Evidence Code section 1040, subdivision (b)(2), a public entity has a privilege to refuse to disclose official information if "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ." (Evid. Code, § 1040, subd. (b)(2).) Both statutes involve the same balancing process by the trial court, in which the trial court has the "task of weighing the government's

claim of privilege against the defendant's constitutional right to present a defense," taking into account " 'the consequences to the public of disclosure and the consequences to the litigant of nondisclosure' " (*People v. Jackson* (2003) 110 Cal.App.4th 280, 290-291 (*Jackson*).)

Section 1054.7 states that the trial court must conduct an in camera proceeding to consider whether the prosecution has made a showing of good cause to deny or regulate disclosure of confidential information, and provides that if the trial court grants relief "the entire record of the showing shall be sealed." (§ 1054.7; see also Evid. Code, §915, subd. (b) [providing for in-chambers hears to determine privilege claimed under Evid. Code, § 1040].)

These statutory provisions were applied in this case, when, on several occasions, the trial court considered whether the prosecution had shown good cause to redact or withhold certain items of evidence. According to the statutory procedures, the trial court sealed the record of those proceedings. Ali and the People agree that we should conduct a review of the sealed records to determine whether the trial court abused its discretion. (See *Jackson*, *supra*, 110 Cal.App.4th at pp. 290-291 [reviewing whether the trial court abused its discretion in ruling that the prosecution could withhold certain confidential discovery].) [FN 3 omitted.]

We have reviewed the sealed transcripts contained in the appellate record and have determined, based on the testimony reported therein, that the trial court did not abuse its discretion in finding good cause for the prosecution to withhold discovery of certain confidential information. The evidence supports a finding that release of the confidential information would compromise ongoing law enforcement investigations, and that it did not contain any material that was favorable to the defense. (See *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).)

(Lodgment No. 6 at 6-10.)

*Pitchess* and Evidence Code § 1040 are state provided rights of discovery of certain records under state law, and as such, any errors in the application of the procedures outlined in *Pitchess* and Evidence Code § 1040 are not cognizable on federal habeas review. *Estelle*, 502 U.S. at 67-68. Nevertheless, Ali claims his federal due process rights were violated because the trial court conducted an in camera review of the material, as required by *Pitchess* and Evidence Code § 1040, and he was not permitted to access to it to make an independent determination of materiality.

The Ninth Circuit has recognized that *Pitchess* is essentially a parallel procedure to *Brady* for disclosing exculpatory material but that, under *Pitchess*, a defendant must meet a lower threshold to satisfy his burden and will have access to a broader amount of material if that threshold is met. *See Harrison v. Lockyer*, 316 F.3d 1063, 1065-66 (9th

Cir. 2003).  Here, Ali may contend that his federal due process rights were violated when he was denied access to exculpatory and impeachment material, but in a federal habeas corpus proceeding, the standard for determining whether such a violation has occurred is *Brady*.  Whether Ali has a valid *Brady* claim is discussed in Section IV(F) of this Report and Recommendation, *infra*.

As to his claim that denial of access to Evidence Code § 1040 materials violated his due process rights, the Supreme Court noted in *Roviaro v. United States*, 353 U.S. 53 (1957) that when a defendant seeks evidence helpful and relevant to his defense, and the government seeks to protect information vital to such things as ongoing investigations or the safety of an informant, "no fixed rule with respect to disclosure is justifiable." *Id.* at 62.  Rather, a court must balance the interests of the government and the defendant's right to prepare a defense.  *Id.*  The California Evidence Code procedure outlined in § 1042 and which the trial court employed, is consistent with the mandate of *Roviaro*.  Accordingly, the state appellate court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

F. *Withholding of Exculpatory Evidence*

In claim five, Ali contends the prosecutor withheld exculpatory and impeachment material, which resulted in violations of Ali's fair trial, confrontation, and due process rights as well as his right to effective assistance of counsel.  (Mem. of P. & A. Supp.  Am. Pet. at 51-64.)  Respondent argues the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 16-19.)

Ali raised this claim in the petition for review he filed in the California Supreme Court.  (Lodgement No. 7.)  That court denied the petition without analysis or citation of authority.  (Lodgment No. 8.)  Accordingly, this Court must "look through" to the state appellate Court's decision denying the claim as the basis for its analysis.  *Ylst*, 501 U.S. at 805-06.  That court wrote:

Ali's final discovery-related argument is that the prosecution engaged in certain discovery violations and thereby infringed his constitutional rights.

We first review the legal standards applicable to Ali's claim that his constitutional rights were infringed when the prosecutor failed to provide discovery. "Under the federal Constitution's due process clause, as interpreted by the high court in *Brady v. Maryland*, *supra*, 373 U.S. [at page 87], the prosecution has a duty to disclose to a criminal defendant evidence that is ' "both favorable to the defendant and material on either guilt or punishment." ' " (*In re Bacigalupo* (2012) 55 Cal.4th 312, 333.) " 'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. [Citation.] Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).) Thus, under *Brady*, "there is no 'error' unless there is also 'prejudice.' " (*In re Sassounian* (1995) 9 Cal.4th 535, 545, fn 7.) [FN 4 omitted.]

Ali contends that the prosecutor violated the obligation to provide discovery under *Brady*. But instead of focusing on any specific items, Ali claims that "[t]here was a pervasive failure to provide material discovery to the defense . . . ," and he "was prejudiced at every turn." In a portion of Ali's argument that is separate from his discussion of legal principals, Ali reviews the long history of discovery proceedings in this case. [FN 5 omitted.] However, Ali does not take the necessary step of developing his appellate argument to explain which items of withheld or delayed discovery were material and created prejudice.

Because Ali has failed to discuss any specific discovery violations that he contends warrant reversal, his appellate briefing is woefully inadequate. "An appellate court is not required to examine underdeveloped claims, nor to make arguments for parties." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) Our role is to evaluate " 'legal argument with citation of authorities on the points made.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*).) Specifically, as applied to Ali's claim that the prosecutor violated the obligation to provide discovery under *Brady*, Ali's inadequate briefing causes two fatal deficiencies in his legal argument.

First, as we have explained, *Brady* applies only to evidence that is " 'favorable to the accused, either because it is exculpatory, or because it is impeaching.' " (*Salazar*, *supra*, 35 Cal.4th at p. 1043.) Because Ali does not, in the course of his argument, identify any *specific* discovery violations on which he premises his *Brady* argument, he has not attempted to establish, as required by *Brady*, that the items of withheld or delayed discovery were favorable to the accused.

Second, to establish a *Brady* violation, Ali must establish prejudice by showing " ' "a reasonable probability of a different result." ' " (*Salazar*, *supra*, 35 Cal.4th at p. 1043.) Ali has not attempted to explain how any specific discovery violation caused prejudice in this case. Indeed, Ali relies solely on generalized statements such as that "every item of withheld or delayed discovery impacted adversely the directly the ability of defense counsel to prepare for the preliminary hearing and trial, to challenge the prosecution witnesses' credibility, and to raise doubt about the reliability of the prosecution's case," and that he was "deprived of a reasonable time to analyze the evidence against him and mount a thorough, well prepared, cohesive defense." [FN 6 omitted.] Ali's "generalized statements are insufficient to demonstrate prejudice." (*People v. Verdugo* (2010) 50 Cal.4th 281-282), and stand in sharp contrast to the case that Ali relies on, which discusses *specific* items of withheld discovery that were relevant to the defense. (*People v. Johnson* (2006) 142 Cal.App.4th 776, 782-786.)

We accordingly conclude that Ali has failed to establish that his constitutional rights were violated by the prosecutor's purported discovery violations during the course of this action.

(Lodgment No. 6 at 10-13.)

As correctly stated by the state court, "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In order to establish a *Brady* violation, a defendant must establish three things: (1) the evidence was suppressed by the prosecution, either willfully or inadvertently, (2) the withheld evidence was either exculpatory or impeachment material, and (3) the evidence was material to the defense. *Benn v. Lambert*, 283 F.3d 1040, 1052-53 (9th Cir. 2002) (citing *United States v. Bagley*, 473 U.S. 667, 676, 678 (1985) and *United States v. Agurs*, 427 U.S. 97, 110 (1976).) "Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial. *Benn*, 283 F.3d at 1053 (citing *Bagley*, 473 U.S. at 676; *Agurs*, 427 U.S. at 111-12). "Moreover, we analyze all of the suppressed evidence together, using the same type of analysis that we employ to determine prejudice in ineffective assistance of counsel cases." *Id.* (citing *Bagley*, 473 U.S. at 682 and *United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986).)

As he did in state court, Ali recounts the history of discovery proceedings in a lengthy section comprising over ten pages. (Mem. of P. & A. Supp. Am. Pet. at 50-62.)

Much of those pages simply recount what occurred in terms of discovery, allegations of discovery violations, actions taken and rulings by the trial court without sufficient explanation as to how the allegedly suppressed information was exculpatory or material, and how Ali was prejudiced by that alleged suppression.  In Ali's Memorandum of Points and Authorities in Support of the Amended Petition addressing this claim, the following allegations are specific enough for this Court to address:

1.  The prosecution failed to turn over audio tape recordings of witnesses until six months after they were in possession of the prosecutor.  (*Id.* at 57.)

2.  The passage of 18 months between the crimes and the trial resulted in the defense being unable to locate witnesses.  (*Id.* at 58.)

3.  Witnesses Tiffany Patton and Donald Robinson became uncooperative with the defense after speaking to the prosecutor's investigator.  (*Id.*)

4.  The prosecution failed to turn over information on their cell phone tower expert until three weeks before trial.  (*Id.* at 59.)

5.  The prosecution failed to turn over information about the Arizona investigation into Freeman's death until three weeks before trial.  (*Id.*)[3]

6.  The prosecution discovered late in the trial that one of the seized cell phones was not locked as previously thought and sought to introduce contact information from the phone.  (*Id.* at 60.)

7.  The prosecution "sat on" information concerning Freeman's conduct and state of mind after he went to Arizona, by claiming it was irrelevant."  The trial court then accused the prosecution of "hiding" behind Evidence Code § 1040.  (*Id.*)

8.  The prosecution failed to provide discovery on police officer Scott Holden of the gang suppression unit who testified about "gang encounters

---

[3]  Ali also claims the prosecution delayed charging Marcus House until three years after he committed the crimes with which he was charged, and that the purpose of this delay was to "prevent House from testifying for Mr. Ali by forcing House to exercise his Fifth Amendment privilege."  This is an allegation of prosecutorial misconduct, not a *Brady* violation, and will be addressed in Section IV(J) of this R&R.

with Ali and about gangs generally." (*Id.* at 60-61.)

9.  The prosecution did not provide discovery on the personal knowledge of the gang expert who testified regarding the predicate acts for the gang enhancements or on the "underlying factual basis for the predicate gang acts." (*Id.* at 62.)

10.  The prosecution presented testimony from District Attorney investigator Shane Lynn about threats to two prosecution witnesses without providing discovery on those witnesses. (*Id.* at 61.)

11.  The prosecution withheld impeachment evidence on defense witness Lula Ali who testified Ali was at home on the day and evening of the shootings. (*Id.* at 62.)

12.  The prosecution withheld 80 CD's of interviews and by the time they were disclosed, the witnesses were unavailable. (*Id.*)

Assuming without deciding that Ali has established the prosecution suppressed this evidence, the state court's conclusion that Ali has not established the other two prongs of a *Brady* violation — materiality and prejudice — was not unreasonable. *See Brady*, 373 U.S. at 87; *Benn*, 283 F.3d at 1052-53. Ali does not allege any *specific facts* as to what exculpatory or impeaching information was in the audio tape recordings (incident no. 1), information about the cell phone expert (incident no. 4), the Arizona investigation into Freeman's death (incident no. 5), the testimony about "gang encounters with Ali and gangs generally" by Holden (incident no. 8), the testimony about his personal knowledge of gangs and the predicate gang acts by Detective Malinowski (incident no. 9), the testimony by investigator Lynn about threats to prosecution witnesses (incident no. 10), and the 80 CD's of interviews that were turned over late (incident no. 12), or what specific witnesses and exculpatory evidence was lost as a result of the 18 month delay in beginning the trial (incident no. 2). He only alleges violations of state discovery statutes and generalized "unfairness." That is not sufficient to satisfy *Brady*. As to Ali's allegation that the prosecution was obligated to disclose impeachment

information regarding defense witness Lulu Ali, *Brady* applies to impeachment information of prosecution witnesses, not defense witnesses, and there is no clearly established Supreme Court law that requires the prosecution to turn over evidence that impeaches a defense witness, or that such evidence would be considered "favorable to the accused." *See Malone v. Felker,* 453 Fed. Appx. 754 (9th Cir. 2011).[4]

In any event, Ali does not specify what prejudice he suffered as a result of any delayed discovery or lack of discovery. Evidence is material for purposes of *Brady* only if it undermines confidence in the outcome of the trial. *Benn*, 283 F.3d at 1053. Ali does not explain how any of the allegedly delayed or missing evidence would have resulted in a different outcome in the face of the evidence presented at trial. Freeman testified Ali confessed to the July 22, 2008 shootings. (Lodgment No. 2, vol. 11 at 2618-22, 2625-29.) Forensic and ballistic evidence connecting Ali with the gun used in both shootings. (Lodgment No. 2, vol. 16 at 4537, 4551-52, 4558, 4581.) James Gomez testified he saw Ali walk by him right before the College Avenue shooting. (Lodgment No. 2, vol. 12 at 2766.) Ali does not explain what suppressed or delayed evidence would have successfully countered the prosecution's evidence.

Further Ali's allegations that Tiffany Patton and Donald Robinson became uncooperative with the defense after talking to the District Attorney's investigator does not state a *Brady* claim. Ali provides no support for his claim that the prosecution suppressed any evidence related to Patton or Robinson or that the prosecution was connected to their change of heart. As to Ali's allegation the previously-thought-to-be-locked phone, the trial court excluded that information from the prosecution's case in chief. (Lodgment No. 2, vol. 15 at 4207-08.) Since there is no *Brady* violation, there is insufficient support for Ali's claim that he was denied effective assistance of counsel as a result of *Brady* violations.

For all the foregoing reasons, the state court's resolution of this claim was neither

---

[4] Pursuant to Ninth Circuit Rule 36-3(c), "Unpublished decisions and orders of [the Ninth Circuit] issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1."

contrary to, nor an unreasonable application of, clearly established Supreme Court law, nor was it based on an unreasonable determination of the facts. *Williams*, 528 U.S. at 412-13; 28 U.S.C. § 2254(d)(2). Ali is not entitled to relief as to this claim.

G. *Refusal to Grant Immunity*

In claim six, Ali contends the state trial judge violated his due process, confrontation, and compulsory process rights when he refused to grant immunity to two defense witnesses, Marcus House and Hunter Porter, after the prosecution declined to grant immunity. (Mem. of P. & A. Supp. Am. Pet. at 64-73.) Respondent argues there is no clearly established Supreme Court law that establishes a trial court has such authority. (Mem. of P. & A. Supp. Answer at 28-30.) In the alternative, Respondent notes that even under Ninth Circuit authority which provides for such immunity in certain cases, the facts of Ali's case do not warrant relief. (*Id.*)

Ali raised this claim in the petition for review he filed in the California Supreme Court. (Lodgement No. 7.) That court denied the petition without analysis or citation of authority. (Lodgment No. 8.) Accordingly, this Court must "look through" to the state appellate court's decision denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06. That court wrote:

> Ali sought to call Marcus House and Hunter Porter as witnesses. However, both men invoked their Fifth Amendment right not to testify on the basis that their testimony might incriminate them. The trial court denied Ali's request that it grant use immunity to House and Porter so that they could testify without danger of being prosecuted based on their testimony. [FN 8 omitted]. Ali contends that, in doing so, the trial court erred. [FN 9 omitted].
>
> Before analyzing Ali's argument, we provide and overview of House's and Porter's expected testimony.
>
> Porter was a Lincoln Park gang member who was serving a 26-year term for attempted murder and was charged as a defendant in a prosecution for a series of bank robberies. He participated in an interview with district attorney investigators in June 2010, during which he made some statements about Freeman. Most significantly, according to Porter, Freeman had participated in bank robberies with him. Porter also stated that on one occasion Freeman had stolen some of the proceeds of the robberies from other participants. In seeking immunity for Porter, defense counsel argued that Porter's statement that Freeman committed bank robberies would have value in impeaching Freeman's credibility because Freeman had claimed in his interviews with law enforcement that he did *not* participate in any of the

Lincoln Park bank robberies.  Further, if Freeman had stolen robbery proceeds from fellow gang members, that fact would suggest that Freeman was also willing to double-cross Ali by framing him for the July 22, 2008 shootings.

House, who was also a Lincoln Park gang member, was serving a 20-year prison sentence and had been charged with several bank robberies along with Porter.  House spoke to defense counsel and defense counsel's investigator in April 2010, telling them that Freeman claimed to have committed the July 22, 2008 shooting at the College Avenue apartments, together with someone called "L."  House also claimed to have given Freeman a gun used in the July 22, 2008 shooting.

We next turn to the legal principles applicable to Ali's contention that the trial court was required to grant use immunity to House and Porter.  No California statute or case authorizes a trial court to grant immunity to a witness when not requested to do so by the prosecutor.  Indeed, granting immunity to a witness "is an executive function."  (*People v. Williams*, *supra*, 43 Cal.4th at p. 622.)  "[T]he decision to seek immunity is an integral part of the *charging* process, and it is the prosecuting attorneys who are to decide what, if any, crime is to be charged."  (*In re Weber* (1974) 11 Cal.3d 703, 720.)  In accordance with this view, our Supreme Court has noted "the Courts of Appeal of this state have uniformly rejected the notion that trial court has the inherent power . . . to confer use immunity upon a witness called by the defense."  (*People v. Hunter* (1989) 49 Cal.3d 957, 973 (*Hunter*).)  [FN 10 omitted.]  Further, our Supreme Court has " 'characterized as "doubtful" the "proposition that the trial court [possesses inherent authority to grant immunity." ' "  (*Samuels*, *supra*, 36 Cal. 4th at

p. 127.)  Indeed, it has "expressed reservations concerning [such] claims."  (*People v. Williams*, *supra*, 43 Cal.4th at p. 622.)

As Ali points out, our Supreme Court has in dicta, on several occasions, acknowledged case law from the federal Third Circuit Court of Appeals (*Government of Virgin Islands v. Smith* (3d Cir. 1980) 615 F.2d 964 (*Smith*)), which holds that a judicial grant of use immunity could be required to preserve the defendant's constitutional right to a fair trial and compulsory process in certain specific circumstances.  (*Hunter*, *supra*, 49 Cal.3d at p. 974.) [FN 11 omitted].  In each case, our Supreme Court has discussed the factors described in *Smith* and, in each case, has concluded that *if* the factors were a correct statement of the law, they would *not* be satisfied.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 619; *In re Williams*, *supra*, 7 Cal.4th at p. 610; *Lucas*, *supra*, 12 Cal.4th ap. p. 459; *People v. Stewart* (2004) 33 Cal.4th 425, 568; *Samuels*, *supra*, 36 Cal.4th at p. 128.)  Our Supreme Court's discussion of the factors set forth in *Smith* was always presented as dicta and was unnecessary to the decision.

We join our colleagues in the First District in *Cooke* and "decline appellant's invitation to declare a doctrine of judicial use immunity for defense witnesses in criminal cases . . . . [N]o California Court of Appeal or Supreme Court case has ever granted such immunity to a defense witness, and we will not do so now.  The relief which appellant here requests should be granted, if at all, by our state's highest court."  (*Cooke*, *supra*, 16 Cal.App.4th at p. 1371.)  We accordingly reject Ali's contention that the trial court was required to grant use immunity to House and Porter.

(Lodgment No. 6 at 17-21.)

As Respondent notes, and Ali implicitly acknowledges, there is no clearly established Supreme Court law which establishes a trial court has the authority to grant use immunity, much less under what circumstances such immunity must be granted to protect a defendant's constitutional rights. This alone precludes relief for Ali. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006).

Ali cites *Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980) as support for his contention that courts have the power to grant immunity to defense witnesses. Although the Third Circuit subsequently abandoned judicial immunity as a remedy for prosecutorial misconduct in *United States v. Quinn*, 728 F.3d 243, 257 (3d Cir. 2013), the Ninth Circuit has adopted a similar rule in *Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004), a pre-AEDPA case. There, the Court stated:

> [T]he prosecution's refusal to grant immunity to a defense witness denies the defendant a fair trial only when (1) the witness's testimony would have been relevant, and (2) the prosecution refused to grant the witness use immunity with the deliberate intention of distorting the fact-finding process. *See United States v. Westerdahl*, 945 F.2d 1083, 1086 (9th Cir.1991); *United States v. Lord*, 711 F.2d 887, 891 (9th Cir.1983). To demonstrate the prosecutorial misconduct of the second prong, Williams must show that the prosecution intentionally caused a defense witness to invoke the Fifth Amendment right against self-incrimination, or that the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness. *See United States v. Duran*, 189 F.3d 1071, 1087 (9th Cir.1999).

*Id.* at 600.

Assuming without deciding that Ali meets the first prong of the test, i.e., that House's and Porter's testimony was relevant, Ali argues the trial court's refusal to grant them immunity "intentionally distorted the fact-finding process" by: (1) intentionally causing House to invoke his Fifth Amendment rights, and (2) by selectively granting immunity to Porter when it helped the government's case via the "free talk" Porter had with prosecutors but denying it when it helped the defendant. (Mem. of P. & A. Supp. Am. Pet. at 70-72.)

Ali alleges it was the prosecutor's "intervention" during an ex parte hearing that triggered House's invocation of his Fifth Amendment rights. (*Id.* at 66-67.) The record supports a conclusion, however, that it was Ms. Feral, House's counsel, who advised House to invoke his Fifth Amendment rights because of concern regarding gang allegations in a criminal case that was pending against House at the time:

> THE COURT: All right.  At this point, then, there's a couple determinations that we need to make, including whether or not the Fifth Amendment applies.  But we're not doing that today.
>
> MS. FERAL: I can proffer, just based on the gang allegations and based on Mr. House's new case that he was arraigned on on Monday, there is a gang allegation attached to each and every one of the counts in that new case pending.  And, apparently, on of Mr. House's prior felony convictions is being used in this case as a predicate offense for — to prove up the 186 in this case.  So just based on that alone, it's a Fifth Amendment.
>
> THE COURT: All right.  So, basically, based on — he is currently in custody; correct?
>
> MS. FERAL: Yes.
>
> THE COURT: If it's pimping and pandering, why is he in federal custody?
>
> MR. FUNK: He's not in federal custody.
>
> THE COURT: He's in state custody?
>
> MR. FUNK: It's Mr. Coombs you're thinking of.
>
> MR. PANISH: His new case is a 211 [robbery] series.
>
> THE COURT: And he's got, obviously — just so we're clear, he's got the pending 211's with a gang allegation?
>
> MS. FERAL: Yes.
>
> THE COURT: And I assume that somewhere during these questions somebody's going to ask him about his — either his current case or the gang allegation?  Certainly the gang allegation would have to come up; correct?
>
> MS. FERAL: Or his status in the gang.  So that will include a lot of other questions.  So just based on that alone.
>
> THE COURT: All right.  All right.  Well, I think we're done with Mr. House for right now.  We can go on with our other matters and sort out.

(Lodgment No. 2, vol. 6 at 1561-62.)

It appears that prosecutors informed the Court during the ex parte hearings of the

pending case against House and the fact that he would need to be represented by counsel before any testimony. Ali suggests the timing of the charges against House were designed to force him to exercise his Fifth Amendment privilege. But, there is simply no evidence in the record, beyond speculation, that prosecutors engaged in any nefarious dealings during the ex parte hearing, the charging process, or at any other time which "distorted the fact-finding process" with regard to House. *Williams*, 384 F.3d at 600.

Porter was House's co-defendant in the pending robbery case. (Lodgment No. 2, vol. 10 at 2437.) Porter engaged in a "free talk" with prosecutors during which he agreed to provide evidence on his pending case as well as other cases in the hopes of reducing his criminal liability. (*Id.* at 2438.) Any information provided in that "free talk" would not be used against him. (*Id.*) Ali argues this is essentially "use immunity," and that the refusal of prosecutor to grant immunity for Porter to testify "distorted the fact-finding process" or granted immunity selectively. (Mem. of P. & A. Supp. Am. Pet at 71-72.) Neither conclusion is supported by the record. District Attorney investigator William Cahill testified it was Porter's attorney who approached law enforcement offering to give information about his own and other cases in the hope of obtaining some benefit. (Lodgment No. 2, vol. 10 at 2438.) Prosecutors did not seek out Porter and seem to have been taken by surprise that Porter had any information about Ali's case or Freeman. (*Id.* at 2438-46.) Moreover, prosecutors did not enter into a formal immunity agreement with Porter, nor did they grant immunity to government witnesses while denying it to defense witnesses. *See Williams*, 384 F.3d at 600.

There is no clearly established Supreme Court law which holds a trial court can grant immunity to a defense witness. To the extent that Ninth Circuit law so holds, the record does not support a finding that prosecutors in Ali's case "refused to grant the witness use immunity with the deliberate intention of distorting the fact-finding process," "intentionally caused a defense witness to invoke the Fifth Amendment right against self-incrimination", or "granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would

1    have directly contradicted that of the government witness." *See id.* Accordingly, Ali is

2    not entitled to relief as to this claim. *Williams*, 529 U.S. at 412-13.

3         H.  *Introduction of Jesse Freeman's Preliminary Hearing Testimony*

4         Ali argues the introduction of Freeman's preliminary hearing testimony violated

5    his Sixth Amendment confrontation clause rights because defense counsel did not have

6    all of the discovery requested and could therefore not properly cross-examine Freeman.

7    (Mem. of P. & A. Supp. Am. Pet. at 74-77.)  Specifically, Ali complains he did not have

8    the statements by House and Porter, made months after the preliminary hearing, about

9    Freeman's alleged confession to the College Avenue shooting, or Freeman's alleged

10   involvement in bank robberies, and was therefore unable to question him about them.

11   (*Id.*)  Respondent counters that the state court's resolution of this claim was consistent

12   with clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 22-24.)

13        Ali raised this claim in the petition for review he filed in the California Supreme

14   Court.  (Lodgement No. 7.)  That court denied the petition without analysis or citation of

15   authority.  (Lodgment No. 8.)  Accordingly, this Court must "look through" to the state

16   appellate court's decision denying the claim as the basis for its analysis.  *Ylst*, 501 U.S.

17   at 805-06.  That court wrote:

18        As we have explained, Freeman testified at the preliminary hearing,
     describing Ali's admission to the two July 2008 shootings.  Freeman died
19   eight days later, making him unavailable at trial.  The trial court denied
     Ali's motion to exclude Freeman's preliminary hearing testimony and
20   allowed Freeman's testimony to be read to the jury.  Ali contends that his
     constitutional rights to due process and to confront witnesses were violated
21   by the admission at trial of Freeman's preliminary hearing testimony. [FN
     7 omitted.]
22
          The confrontation clause of the Sixth Amendment guarantees a
23   criminal defendant the right to cross-examine witnesses against him.
     (*Crawford v. Washington* (2004) 541 U.S. 36, 54) (*Crawford*).)  Under
24   *Crawford*, "[a]n exception to the confrontation requirement exists where the
     witness is unavailable, has given testimony at a previous judicial proceeding
25   against the same defendant, and was subject to cross-examination by that
     defendant."  (*People v. Carter* (2005) 36 Cal.4th 1114, 1172.)  The United
26   States Supreme Court has stated that when a witness is
     not available at trial, "preliminary hearing testimony is admissible only if
27   the defendant had an *adequate* opportunity to cross-examine" the witness.
     (*Crawford*, at p. 57, italics added.)  For example, in *California v. Green*
28   (1970) 399 U.S. 149, 166, the high court noted that the preliminary hearing
     testimony of an unavailable witness was admissible, in part, because

"counsel does not appear to have been significantly limited in any way in the scope or nature of his cross-examination of the witness . . . at the preliminary hearing." The high court has explained, however, that " in all but . . . extraordinary cases, no inquiry into 'effectiveness' [of cross-examination] is required." (*Ohio v. Roberts* (1980) 448 U.S. 56, 73, fn. 12.) As described by the Supreme Court, an "extraordinary case" would be one in which defense counsel who conducted the prior cross-examination had already been determined to have provided ineffective assistance at that hearing. (*Ibid.*)

In California, "Evidence Code section 1291 codifies this traditional exception" to the confrontation clause described in *Crawford* for an unavailable witness who has been previously cross-examined. (*People v. Friend* (2009) 47 Cal.4th 1, 67.)   " 'Evidence Code section 1291, subdivision (a)(2) provides that former testimony is not rendered inadmissible as hearsay if the declarant is "unavailable as a witness," and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." ' " (*Friend*, at p. 67.) "'When the requirements of Evidence Code section 1291 are met, "admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution." ' " (*Ibid.*)

Here, defense counsel extensively cross-examined Freeman at the preliminary hearing, with the cross-examination consuming 57 pages of the reporter's transcript. According to our review of that transcript, the cross-examination was thorough and well-executed. Further, defense counsel had the same motivation in cross-examining Freeman during the preliminary hearing as would have been the case at trial, namely to discredit Freeman's claim that Ali had admitted to the July 22, 2008 shootings. Defense counsel had an added incentive to perform a thorough cross-examination at the preliminary hearing because both defense counsel and the prosecutor acknowledged at the preliminary hearing that Freeman might not be available at trial, in that he was being threatened even while in protective custody and had a history of avoiding contact with the authorities who were trying to locate him.

Ali contends that defense counsel's cross-examination of Freeman was nevertheless inadequate to satisfy the confrontation clause because of the prosecution's failure to provide discovery that could have been used to cross-examine Freeman at the preliminary hearing. Specifically, Ali points to a statement given by Marcus House to the defense investigator and counsel in April 2010 — a year and a half *after* the preliminary hearing. According to House, who was in prison, Freeman had claimed that he committed the July 22, 2008 shooting at the College Avenue apartments, not Ali.

Ali's argument is unpersuasive. First, the discovery that Ali contends the prosecution did not provide prior to Freeman's preliminary hearing testimony *did not yet exist*, and consisted of a witness's statement elicited many months later by the *defense*, not by the prosecution.  Second, the availability of new information to impeach a witness *after* cross-examination concludes does not render the cross-examination ineffective for the purposes of the confrontation clause.  In *People v. Valencia* (2008) 43 Cal.4th 268, our Supreme Court rejected the argument that prior testimony

of an unavailable witness was inadmissible because defense counsel's "cross-examination of [the witness] would have been different had the impeaching information been known at the time he testified." (*Id.* at p. 293.) As our Supreme Court explained, " ' "Both the United States Supreme Court and this court have concluded that 'when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation clause requirement [citation], regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony." ' " (*Id.* at p. 294.) "Admission of the former testimony of an unavailable witness . . . does not offend the confrontation clauses of the federal or state Constitutions — not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of cross-examination at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution." (*People v. Zapien* (1993) 4 Cal.4th 929, 975.)

In sum, there is no merit to Ali's contention that the trial court improperly admitted Freeman's preliminary hearing testimony.

(Lodgment No. 6 at 13-17.)

*Crawford v. Washington*, 541 U.S. 36 (2004) is the clearly established law that applies to this claim. In *Crawford*, the Supreme Court stated:

Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law — as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

*Id.* at 68.

The *Crawford* court also noted, however, that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59. The Supreme Court has stated that an "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) quoting *Delware v. Fensterer*, 474 U.S. 15, 20 (1985).

Ninth Circuit cases have consistently held that sworn testimony, when given at a preliminary hearing and subject to cross-examination, is admissible under *Crawford* and *California v. Green*, 399 U.S. 149, 165 (1970), when the declarant is unavailable. *See e.g. Smith v. Harrison*, 378 Fed. Appx. 767, 768 (9th Cir. 2010); *Rust v. Hall*, 346 Fed. Appx. 163, 165 (9th Cir. 2009); *Magdaleno v. Giurbino*, 292 Fed. Appx. 528, 529 (9th Cir. 2008); *Bolton v. Knowles*, 225 Fed. Appx. 487 (9th Cir. Mar. 15, 2007). Given this authority, the state court's resolution of this claim cannot be said to have been contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. 412-13. Nor has Ali established the resolution of this claim was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Ali is not entitled to relief as to this claim.

I. *Jury Instructions*

Ali contends the trial court violated his right to a fair trial and his due process rights when it refused to give a special jury instruction regarding benefits given to Freeman, Omar and the Gomez family and how those benefits may have influenced their testimony. (Mem. of P. & A. Supp. Am. Pet. at 77-88.) Respondent contends there is no clearly established Supreme Court law that requires such an instruction, and so the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 33-35.)

Ali raised this claim in the petition for review he filed in the California Supreme Court. (Lodgement No. 7.) That court denied the petition without analysis or citation of authority. (Lodgment No. 8.) Accordingly, this Court must "look through" to the state appellate court's decision denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06. That court wrote:

> Ali contends that the trial court erred by failing to give a requested pinpoint instruction informing the jury that in assessing the testimony of certain witnesses, it should consider the benefits that those witnesses received from the prosecution. As necessary factual background, we observe that Ali's request for the jury instruction related to the testimony of four witnesses. The first witness, Ahmed Omar, was Ali's neighbor, who described how Ali had given him bullets to keep in his apartment. The jury heard evidence that Omar received threats and was relocated by the district

attorney to a different state, receiving monthly payments for his living expenses. The second witness was Freeman (presented through his preliminary hearing testimony), who was relocated by authorities to Arizona, receiving benefits totaling $2,409 before his death. The final two witnesses were the teenage boy (James Gomez), who saw Ali at the College Avenue apartments during the shooting; and his mother (Yvonne Gomez), who testified about what her son had told her about his identification of Ali. Evidence was presented at trial that a district attorney investigator had assisted Yvonne Gomez by checking on the status of a police investigation concerning another of her sons.

The CALCRIM instructions do not contain a specific instruction addressing how the jury should view witnesses who receive benefits from the prosecution. Ali accordingly requested that the trial court give an instruction based on a model instruction from the federal Ninth Circuit Court of Appeals, which stated: "You have heard testimony that [the witness] has received benefits, compensation, favored treatment, from the government in connection with this case. You should examine [the witness's] testimony with greater caution than that of other witnesses. In evaluating that testimony, you should consider the extent to which it may have been influenced by the receipt of benefits from the government." The

trial court declined to give the instruction, explaining (1) that the substance of the requested instruction was covered by other instructions; and (2) as to the Gomez family, there was no evidence of any benefit received.

As we have explained, " 'a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation].' " (*Hartsch*, *supra*, 49 Cal.4th at p. 500.) All three considerations are relevant here.

First, we agree with the trial court's conclusion that the evidence did not support a finding that the Gomezes received any benefit from the prosecution, as the evidence is that the district attorney investigator merely provided information about the status of a police investigation but did not influence the investigation in any way. Therefore, substantial evidence did not support an instruction with regard to the Gomezes.

Second, with respect to the requested instruction being duplicative, the jury was instructed with CALCRIM No. 226, which states: "In evaluating a witnesses testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors you may consider are: [¶] . . . [¶] Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided." As the trial court pointed out, this instruction sufficiently instructed the jury to consider a witness's bias and allowed the defense to argue that the witnesses were biased because of benefits they received from the prosecution.

Third, the instruction proposed by defense counsel was improperly argumentative in that it *required* an inference not supported by law. Specifically, the instruction would have directed the jury that it *must* view the witness's testimony in a specific way, i.e., *with greater caution*. However, there is no legal authority for such a requirement. Ali points to

authority requiring greater caution when considering the testimony of accomplices or in-custody informants. (§§ 1111, 1127a). However, no such authority exists for witnesses provided relocation services, just as no authority exists for an instruction requiring a juror to view the testimony of an immunized witness with greater caution. (*Hunter*, *supra*, 49 Cal.3d at pp. 977-978.) As our Supreme Court has explained in that context, "[t]he general rule, of course, is that the jury decides all questions of fact, including the credibility of witnesses . . . . A cautionary instruction, by obligating the jury to view with skepticism the testimony of an immunized witness, impinges on the jury's otherwise unfettered power to determine the witness's credibility." (*Vines*, *supra*, 51 Cal.4th at p. 883, citation omitted.) The instruction therefore fails as unduly argumentative because without legal basis, it " 'invite[d] the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (*People v. Mincey* (1992) 2 Cal.4th 408, 437.)

In sum, we reject Ali's argument that the trial court erred by refusing to instruct the jury on benefits received from the prosecution by certain witnesses.

(Lodgment No. 6 at 31-34.)

Instructional error can form the basis for federal habeas corpus relief only if it is shown that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' [citation omitted]." *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (citing *Cupp v. Naugh'ten*, 414 U.S. 141, 146 (1973)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The allegedly erroneous jury instruction cannot be judged in isolation, however. *Estelle*, 502 U.S. at 72. Rather, it must be considered in the context of the entire trial record and the instructions as a whole. *Id.*

The jury instruction proposed by Ali was modeled after Ninth Circuit Criminal Jury Instruction 4.10 which applies to informants and accomplices. (*See* Lodgment No. 1, vol. 4 at 869-71.) The proposed instruction stated as follows:

You have heard testimony that _____, a witness, has received (benefits, compensation, favored treatment, etc.) from the government in connection with this case. You should examine _____'s testimony with greater caution than that of ordinary witnesses. In evaluating that testimony, you should consider the extent to which it may have been influenced by the receipt of (e.g., benefits) from the government.

(Ninth Cir. Crim. Jury Instr. 4.10 (1997).)

Although the requested instruction was not given, the jury was instructed with a general admonition regarding witnesses:

You alone, must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe.

In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are:

. . . .

- Was the witness's testimony influenced by a factor such as bias, or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

. . . .

- How reasonable is the testimony when you consider all the other evidence in the case?

- Did other evidence prove or disprove any fact about which the witness testified?

- Did the witness admit to being untruthful?

- Has the witness been convicted of a felony?

- Has the witness engaged in other conduct that reflects on his or her believability?

. . . .

If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest.

(Lodgment No. 1, vol. 4 at 0888-89.)

The jury was told that Freeman was given $2,409.95, the majority of which was for hotel and apartment expenses associated with relocating him for his safety. (Lodgment No. 2, vol. 20 at 5325.) The jury also heard evidence about Freeman's relationship with Lincoln Park and his desire to get out of the gang lifestyle. Freeman testified he was "basically through with the gang-banging," and that "friends of [his] knew of a guy that was going to kill me . . . [but] nobody told [him] anything."

(Lodgment No. 2, vol. 11 at 2630.)  He testified that because of his testimony his life was in danger and he could no longer go back to the neighborhood in which he was raised. (*Id.* at 2632.)  Freeman also testified on cross-examination that "L," the person with whom Freeman alleged Ali committed the shootings, had threatened to kill Freeman. (*Id.* at 2662.)  Freeman further admitted that he told police during his initial interviews that he had "information on a lot of shit, pretty much whatever you need," and that police should "tell [him] whatever I need to give today so that I can get up out of here, and I will give it to you." (*Id.* at 2665.)  And, Freeman testified that Detective Opplinger told him that in exchange for information, law enforcement could "offer him a showcase" of benefits, "start [him] on a new life for [him] and his family," and that his basic living needs — expenses such as utilities, rent, food, clothing, and some spending money — would be supported by law enforcement until the case against Ali had concluded. (*Id.* at 2676, 2680-82.)

The jury was instructed to use "common sense and experience" and "anything that reasonably tends to prove or disprove the truth or accuracy" in its evaluation of Freeman's testimony, as well as factors such as "bias, or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided." (Lodgment No. 1, vol. 4 at 0888-89.)  "Common sense" would surely have led the jury to consider the real possibility that Freeman gave information implicating Ali and testified against him because he was biased (his desire to leave the gang lifestyle and possible revenge on "L"), and had a personal interest in the outcome of the case (further relocation money and other assistance from law enforcement.)

Omar also received benefits from law enforcement.  Shortly after his apartment was searched and he told law enforcement about Ali giving him the sock full of bullets to hide, he asked the district attorney's office to be relocated. (Lodgment No. 2, vol. 13 at 3762-63.)  He testified he was afraid for his family's safety and that someone had told him not to testify. (*Id.* at 3766-67.)  The district attorney's office paid for some of his moving and relocation expenses, and he had received assistance with his rent in the

amount of $500 per month since October of 2008, a period of about 20 months, for a total of $10,000. (*Id.* at 3767-69, 3794.) In addition, Omar admitted he possessed marijuana, that officers had found marijuana in his home, and that he was never prosecuted for possession of marijuana. (*Id.* at 3782, 3785.)

As with Freeman, the jury instructions that were given adequately advised the jury to consider the payments made to Omar in evaluating his testimony. Any reasonable juror using his or her "common sense and experience" would consider what effect the payment of $10,000 and a failure to prosecute for possession of marijuana had on Omar's truthfulness and how the $10,000 payment and lack of prosecution "reasonably tend[ed] to prove or disprove the truth or accuracy of that testimony." (Lodgment No. 1, vol. 4 at 0888.) In addition, trial counsel argued during closing argument that Freeman and Omar were motivated to testified against Ali by the benefits the prosecution gave them. (Lodgment No. 2, vol. 25 at 7312-13; 7321-25.)

Finally, with regard to the Gomezes, the state court found there was no evidence supporting a conclusion they received any benefits, and thus the proposed jury instruction was inapplicable to them. (Lodgment No. 6 at 33.) This was not an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). James, who did not identify Ali during police interviews or during the preliminary hearing, later identified Ali as being present at the College Avene shooting and so testified at the trial. (Lodgment No. 2, vol. 12 at 2766.) James testified he did not identify Ali initially because he was scared. (*Id.* at 2768-69.) Defense counsel tried to suggest that James' testimony changed as a result of his brother, Jesse, getting in a fight and promises allegedly made by law enforcement not to prosecute Jesse for that fight. (*Id.* at 2797-98.) Counsel asked James whether D.A. Investigator Lynn assured him that Jesse would not be prosecuted for his involvement in the fight, and James did not recall any such conversation. (*Id.* at 2799-2801.) Yvonne Gomez also testified about interactions with the District Attorney's office regarding Jesse. Unable to get information about what, if anything, was happening with regard to the incident and whether charges were going to be pressed against Jesse for the fight,

Yvonne called Lynn for information.  (*Id.* at 2835-36.)  Lynn testified that no benefits were given to the Gomez family.  (Lodgment No. 2. vol. 20 at 5354.)

Given the above, there was no basis for the trial court to give the requested instruction with regard to the Gomezes because they received no benefits, compensation or favored treatment.  And, as with Freeman and Omar, the instructions sufficiently advised the jury to consider any possible bias James Gomez might have in its evaluation of James' credibility.

Ali cites general principles of due process and fair trial rights in support of his claim, but in the absence of a more specific mandate, the state appellate court's decision cannot be said to have been an unreasonable application of those general principles. *Musladin*, 549 U.S. at 77.  Ali also cites *Banks v. Dretke*, 540 U.S. 668 (2004) and *Cool v. United States*, 409 U.S. 100 (1972), but those cases are inapposite.

In *Banks*, one of the main informants, Farr, testified falsely that he had not received any money or promises from law enforcement.  In fact, Farr was a paid informant who told police Banks would be driving to Dallas to obtain a gun; police arrested Banks en route.  *Banks*, 540 U.S. at 679-80.  Farr also falsely testified at the penalty phase. Prosecutors knew of Farr's false testimony and in closing argument, argued Farr's credibility.  *Id.*  The Court noted how this *Brady* violation affected Banks' due process and fair trial rights because "[t]he jury . . . did not benefit from the customary, truth-promoting precautions that generally accompany the testimony of informants."  *Id.* at 701.  In contrast, the prosecution in Ali's case did not hide the roles Freeman, Omar, and the Gomezes played in the shooting investigation, nor the benefits they received for their roles.  Indeed, as discussed above, the money and benefits Freeman and Omar received were thoroughly discussed at trial.

In *Cool*, three individuals were arrested for possession counterfeit money.  One of the three, Voyles, testified he possessed the counterfeit money but that Cool only gave him a ride and did not know about the counterfeit money.  *Cool*, 409 U.S. at 101.  After warning the jury that accomplice testimony is "open to suspicion," the trial judge

instructed the jury that it could only consider Voyles testimony if they believed it beyond a reasonable doubt, which placed an improper burden on the defense and permitted the jury to find Cool guilty without finding proof beyond a reasonable doubt. *Id.* at 102-03. Ali argues the failure to give the pinpoint instruction as requested similarly reduced the burden of proof on the prosecution because it did not advise the jury to view the testimony of Freeman, Omar and the Gomezes with suspicion. But, as discussed above, / / /

the instructions that were given adequately informed the jury of their duty to consider any biases those witnesses might have had.

The instructions given to the jury in Ali's case adequately informed them to consider the benefits Freeman and Omar received as a result of the testimony. The subject of Freeman's and Omar's motivations, the benefits they received, and the effect such benefits may have had on their testimony were thoroughly presented to the jury and argued at closing argument. As such, the state court's determination that there was no error was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, nor was it an unreasonable determination of the facts. *Williams*, 529 U.S. at 412-13. 28 U.S.C. § 2254(d)(2). Moreover, even if the failure to give the pinpoint instruction was error, it did not, by itself "so infect the entire trial that the resulting conviction violates due process." *Murtishaw*, 255 F.3d at 971. Accordingly, Ali is not entitled to relief as to this claim.

J. *Prosecutorial Misconduct*

Next, Ali contends the prosecutor committed misconduct by failing to comply with discovery obligations and during closing argument. (Mem. of P. & A. Supp. Am. Pet. at 88-92.) Respondent contends the state court's resolution of Ali's claim that the prosecution committed misconduct when it violated discovery obligations was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 19-21.) Respondent argues Ali's claim of prosecutorial misconduct during closing argument is procedurally defaulted. (*Id.* at 21.)

Ali raised this claim in the petition for review he filed in the California Supreme Court. (Lodgement No. 7.) That court denied the petition without analysis and without citation of authority. (Lodgment No. 8.) Accordingly, this Court must "look through" to the state appellate court's decision denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06. That court wrote:

> Ali claims that the prosecutor committed misconduct during closing argument and by engaging in the alleged discovery violations that we discussed above. Prosecutorial misconduct exists " 'under state law only if it involves " 'the use of deceptive or reprehensible methods to attempt to persuade with the court or the jury.' " ' " ' " (*Earp, supra*, 20 Cal.4th at p. 858.) Further, a defendant's federal due process rights are violated when a prosecutor's misconduct " ' " 'infects the trial with unfairness,' " ' " making it fundamentally unfair. (*Ibid*.) A showing of bad faith on the part of the prosecutor is not required to establish misconduct. (*People v. Hill* (1998) 17 Cal.4th 800, 822 (*Hill*).) However, " '[t]o preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition . . . .' " (*Earp*, at p. 858.) As an exception to this rule,"[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if ' "an admonition would not have cured the harm caused by the misconduct." ' " (*Hill*, at p. 820.)
>
> First, we address Ali's contention that the prosecutor's alleged discovery violations rose to the level of prosecutorial misconduct. It is well settled that "in the absence of prejudice to the fairness of the trial, prosecutor misconduct will not trigger reversal." (*People v. Bolton*, (1979) 23 Cal.3d 208, 214.) Here, to support his argument, Ali simply refers back to the argument concerning discovery violations that we have already addressed above. As we explained in our earlier discussion, Ali failed to establish the prejudice necessary to show a violation of his constitutional rights based on purported discovery violations. That failure to establish prejudice is also fatal to Ali's attempt to obtain reversal based on prosecutorial misconduct arising from the same purported discovery violations.
>
> Next, we turn to Ali's contention that the prosecutor committed misconduct during closing argument because "[t]he lack of direct evidentiary references in the prosecutor's initial closing argument deprived [Ali] of the ability to make effective argument relating to the prosecutor's position on specific evidence." Ali argues that "it is misconduct for the prosecutor to structure closing argument in a manner designed to preclude an effective defense reply. He relies on *People v. Robinson* (1995) 31 Cal.App.4th 494 (*Robinson*), in which the prosecutor improperly gave a three and on-half page closing argument followed by a much longer rebuttal argument of 35 pages, in which many issues were raised for the first time. (*Id.* at p. 505 ["Section 1093, subdivision (e) permits the prosecutor to open the argument and close the argument. It does *not* permit the prosecutor to give a perfunctory (three and one-half reporter's transcript pages) opening argument designed to preclude effective defense reply, and then give a

1       'rebuttal' argument — immune from defense reply — 10 times longer (35
reporter's transcript pages) that his opening argument."].)

2

3       We note initially that Ali has not preserved this claim of prosecutorial
misconduct because he did not object in the trial court, and an objection
would not have been futile. (*Hill*, *supra*, 17 Cal.4th at p. 820; *Earp*, *supra*,

4       20 Cal.4th at p. 858.) Indeed, Ali could have asked for the trial court to
remedy any unfairness by allowing defense counsel an additional

5       opportunity for surrebuttal.

6       The substance of Ali's argument fails as well. The prosecutor's
closing argument in this case was nothing like the perfunctory closing

7       argument in *Robinson* and did not preclude an effective defense reply. On

8       the contrary, the prosecutor's closing argument consumed 38 pages of the
reporter's transcript and — in a detailed manner — covered the evidence

9       presented at trial that the prosecutor viewed as establishing Ali's guilt.
Defense counsel's closing was a similar length, consuming 47 pages of the

10      reporter's transcript. The prosecutor's rebuttal argument was much shorter
— at 20 pages, and was directed at responding to issues raised during

11      defense counsel's argument. We accordingly perceive no misconduct in the
way that the prosecutor handled closing argument.

12

13 (Lodgment No. 6 at 34-37.)

14     In order to find prosecutorial misconduct, "[i]t is not enough that the prosecutor's

15 remarks [or actions] were undesirable or even universally condemned." *Darden v.*

16 *Wainwright*, 477 U.S. 168, 181 (1986). Rather, a prosecutor commits misconduct when

17 his or her actions "'so infect . . . the trial with unfairness as to make the resulting

18 conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S.

19 637 (1974).) "[T]he appropriate standard of review for such a claim on writ of habeas

20 corpus is 'the narrow one of due process, and not the broad exercise of supervisory

21 power.'" *Id.* (quoting *Donnelly*, 416 U.S. at 642).)

22     Ali refers the Court to section five of his Memorandum of Points and Authorities,

23 detailed above in section IV(F) of this Report and Recommendation, as support for his

24 contention that discovery violations were so pervasive that he was denied a fair trial. As

25 discussed in Section IV(F) of this Report and Recommendation, there is no evidence to

26 support a contention that exculpatory evidence or impeachment evidence was suppressed

27 under *Brady*. And, as to other discovery issues, Ali provides only a historical recounting

28 of the discovery proceedings and court rulings. He does not make specific allegations as

to what effect on the defense any of the alleged instances of withholding discovery had, such as witnesses or defenses that were lost, specific impeachment material that was not obtained, or evidence that would have helped Ali's defense.  He makes only generalized allegations of unfairness.  His showing is insufficient to establish that any conduct by the prosecutor, assuming it was improper, "'so infect[ed] . . . the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181.

Ali also claims the prosecutor committed misconduct during closing argument by "making a perfunctory, initial closing argument" and a more thorough rebuttal argument, thereby preventing the defense from effectively countering the prosecutor's argument. (Mem. of P. & A. Supp. Am. Pet at 90-92.)  Respondent argues the claim is procedurally defaulted because, as the state appellate court noted, counsel failed make a contemporaneous objection.  (Mem. of P.& A. Supp. Answer at 21; Lodgment No. 6 at 36.)

The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent must first "adequately [plead] the existence of an independent and adequate state procedural ground . . . ." *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).  In order to place the defense at issue, Ali must then "assert[] specific factual allegations that demonstrate the inadequacy of the state procedure . . . ." *Id.*  The "ultimate burden" of proving procedural default, however, belongs to the state. *Id.*  If the state meets its burden under *Bennett*, federal review of the claim is foreclosed unless Ali can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

A state procedural rule is "independent" if the state law basis for the decision is not interwoven with federal law. *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983); *Harris v. Reed*, 489 U.S. 255, 265 (1989).  A ground is "interwoven" with federal law if the state has made application of the procedural bar dependent on an antecedent ruling on federal law such as the determination of whether federal constitutional error has been committed.

*See Ake v. Oklahoma*, 470 U.S. 68, 75 (1985).  "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed'."  *Walker v. Martin*, 562 U.S. 307, 131 S. Ct. 1120, 1127-28 (2011) (quoting *Beard v. Kindler*, 558 U.S. 60-61 (2009).)

Respondent has met his initial burden under *Bennett* by citing *Melendez v. Pliler*, 288 F.3d 1120 (9th Cir. 2002) for the proposition that the contemporaneous objection rule is independent and adequate.  *See id.* at 1125 (stating that "[w]e held more than twenty years ago that the rule is consistently applied when a party has failed to make any objection to the admission of evidence" and citing *Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981)).  The burden therefore shifts to Ali to establish the rule is not independent or adequate.  *Bennett*, 322 F.3d at 586.  He has not presented any evidence or argument demonstrating the rule is not independent or adequate.  Accordingly, he failed to meet his burden under *Bennett*.  *Id.*

Nor has he established either cause or prejudice sufficient to excuse the default. Cause is satisfied if Ali can demonstrate some "objective factor" that precluded him from raising his claims in state court, such as interference by state officials or constitutionally ineffective counsel.  *McClesky v. Zant*, 499 U.S. 467, 493-94 (1991).  He has not done so.

"Prejudice [sufficient to excuse procedurally barred claims] is actual harm resulting from the alleged error."  *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998).  Ali has failed to establish any prejudice would result from the refusal to address the merits of this claim because, as discussed below the claim is meritless.

Finally, Ali has also not demonstrated that failure to consider the claims will result in a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 750.  The Supreme Court has limited the "miscarriage of justice" exception to petitioners who can show that "a constitutional violation has probably resulted in one who is *actually* innocent."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (emphasis added).  "Actual innocence" means factual innocence, not simply legal insufficiency; a mere showing of reasonable doubt is not

enough. *See Wood v. Hall*, 130 F.3d 373, 379 (9th Cir. 1997). Although Ali argues there were errors committed at his trial, he has not presented evidence sufficient to establish he is actually and factually innocent of the charges of which he was convicted. Thus, the claims are procedurally defaulted. *Schlup*, 513 U.S. at 327; *Cooper*, 641 F.3d at 327.

In any event, Ali's claim that the prosecutor committed misconduct by making a perfunctory closing argument fails on the merits. The motion for a new trial cites an instance during closing argument, not rebuttal, in which prosecutor Panish referred to a shell casing found in Ali's bedroom and stated, "There's no way the defense can get around that piece of evidence." (Lodgment No. 1, vol. 4 at 0991.) Ali alleged the statement shifted the burden of proof. (*Id.*) But, taken in context, it was merely a statement about the strength of that particular piece of evidence:

> [THE PROSECUTOR]: Circumstantial evidence in the case, shell casings. Make no mistake about it, ladies and gentlemen, it was the same gun that fired the shots at 47th Street. It was the same gun that fired the shot at College Avenue. It was the same gun that was at the defendant's apartment, and it was the same shell casing that was under the defendant's bed. There is no doubt about that.
>
> You heard from Mr. Loznycky. There is no doubt about that. He is an expert in the field. He examined this with a microscope. He testifies as an expert. He doesn't come in here just to say, oh, they are a match, because he wants to close a case. That's not what he does. He does scientific experiments, and Mr. Reizen had a very lengthy examination of him with the powerpoint to explain exactly what he did in this case.
>
> And that is the most powerful piece of evidence in this case. *There is no way the defense can get around that piece of evidence.* Casing at 47th Street, casing at College, casing at defendant's house. They cannot get around that.
>
> MR. FUNK: Shifting burden, *Griffin* error.
>
> THE COURT: Overruled. Go ahead.
>
> MR. PANISH: Circumstantial evidence. So the only way they can attack it is the interpretation. Okay? Because it is how you interpret the fact. Their interpretation, their theory, is Jesse Freeman. That's their interpretation, and I'm here to tell you that's an unreasonable one based on all of the evidence and all of the facts. They can't get around that fact. That circumstantial evidence is the most powerful thing in the case, no doubt about it, cannot get around it.

(Lodgment No. 2, vol. 25 at 7269-70) (emphasis added.)

At the hearing on the motion for a new trial, defense counsel complained that the prosecutor did not argue any inferences regarding the cell phones found at Ali's residence, but then during rebuttal, argued that cell tower evidence supported the prosecution's theory that Ali had committed the shootings. (Lodgment No. 2, vol. 28 at 8110.)  But defense counsel first argued about the meaning of the cell phone records during closing argument and how those records supported their theory that Freeman, not Ali, committed the shootings.  (*See id.* at 7321, 7326-30.)

A prosecutor may argue reasonable inferences drawn from the evidence presented at the trial.  *See Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986); see also *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996) (quoting *United States v. Baker*, 10 F.3d 1374, 1415 (9th Cir. 1993) and stating that "counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom").  A prosecutor may also reply to comments by defense counsel during closing.  *See Lawn v. United States*, 355 U.S. 339, 359, n. 15 (1958); *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1151 (9th Cir. 2012) citing *United States v. McChristian*, 47 F.3d 1499, 1508 (9th Cir. 1995).  Here, the prosecutor's argument did not "'so infect . . . the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden*, 477 U.S. at 181.  Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.

K.  *Denial of Access to Juror Information*

In claim ten, Ali argues the state court erred when it denied his motion to disclose juror information to pursue a motion for a new trial.  (Mem. of P. & A. Supp. Am. Pet at 92-101.)  Respondent contends the claim is not cognizable on federal habeas review because it concerns only the application of state law.  (Mem. of P & A. Supp. Answer at 35-36.)

A support for this claim, Ali cites two Supreme Court cases, *Bollenbach v. United*

*States*, 326 U.S. 607 (1946) and *Lowenfield v. Phelps*, 484 U.S. 231 (1988).  Both *Bollenbach* and *Lowenfield* addressed situations where the trial judge make remarks to the jury that indicated they were under time pressure to reach a verdict.  *Bollenbach*, 326 U.S. at 612-13; *Lowenfield*, 484 U.S. at 237-39.  That is not what occurred here.  Rather, the only evidence of time pressure is Juror No. 1 and 2's affidavits, which, as discussed in section IV(D) of this Report and Recommendation, are not admissible under Rule 606(b).

The essence of Ali's argument is that the trial court's determination Ali had not presented a prima facie showing of good cause under California Code of Civil Procedure §§ 206(g) and 237 for the disclosure of juror information was improper and a misinterpretation of those code provisions and, as a result, he was denied the opportunity to obtain information to support a motion for a new trial based on juror misconduct.  (Mem. of P. & A. Supp. Am. Pet. at 96-101.)  Whether the trial court denied the motion disclosure of juror information because it misapplied §§ 206(g) and 237 is solely of a challenge to the state court's application of its own law, and is therefore not cognizable on federal habeas review.  *See Estelle*, 502 U.S. at 67-68.  And, in any event, as discussed in section IV(D) of this Report and Recommendation, Ali has not shown any of the juror information that would have been disclosed would be admissible under Rule 606(b) in this proceeding.

For the reasons discussed above, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  The trial court determined that any evidence that jurors felt time pressure, misunderstood the burden of proof, or "referred to racial stereotypes during their discussions of the evidence . . . would have concerned the jurors' thought processes and would not have been admissible in a motion to impeach the verdict."  (Lodgment No. 6 at 42.)  The Supreme Court's decision in *Warger* supports a conclusion that such determination was not unreasonable.  *Williams*, 529 U.S. at 412-13; 28 U.S.C.

1  § 2254(d)(2).

2      L.  *Denial of the Motion for a New Trial*

3      Ali contends the state court's denial of his motion for a new trial based on

4  prosecutorial misconduct was improperly denied.  (Mem. of P. & A. Supp. Am. Pet. at

5  101-102.)  Respondent contends this claim is not cognizable on federal habeas review

6  because it involves only the application of state law.  (Mem. of P. & A. Supp. Answer at

7  21-22.)

8      Ali raised this claim in the petition for review he filed in the California Supreme

9  Court.  (Lodgement No. 7.)  That court denied the petition without analysis or citation of

10 authority.  (Lodgment No. 8.)  Accordingly, this Court must "look through" to the state

11 appellate court's decision denying the claim as the basis for its analysis.  *Ylst*, 501 U.S.

12 at 805-06.  That court wrote:

13         We first consider the portion of the motion for a new trial based on
       prosecutorial misconduct.  Although Ali set forth several theories of
14     prosecutorial misconduct in the motion for a new trial, on appeal he
       discusses only two theories.  We accordingly limit our discussion to those
15     theories.

16         First, Ali's appellate brief argues that the trial court should have
       granted a new trial based on the prosecutor's purported misconduct during
17     closing argument, incorporating by reference the argument we have already
       considered and rejected in part II.D., ante.  This argument fails.  As we have
18     explained, the prosecutor did not commit misconduct during closing
       argument because the prosecutor did not, as Ali claims, wait until the
19     rebuttal to discuss the evidence presented at trial.  In addition, Ali did not
       identify the prosecutor's purportedly belated reference to evidence during
20     closing argument as one of the bases for his new trial motion, and he
       therefore cannot complain on appeal that the motion was not granted on that
21     basis.  (*People v. Masotti* (2008) 163 Cal.App.4th 504, 508 ["A motion for
       new trial may be granted only upon a ground raised in the motion . . . ," and
22     a defendant " 'waives his right to a new trial upon all [statutory] grounds . . .
       unless he specifies the grounds upon which he relies in his application
23     therefore' " (citation omitted) ].)

24         Second, Ali argues that he should have been granted a new trial
       because of the prosecutor's alleged misconduct during discovery.  However,
25     as we have discussed, Ali has failed to establish any discovery violations
       amounting to prosecutorial misconduct.  Based on that conclusion, we also
26     reject his argument that the trial court should have granted a new trial based
       on the prosecutor's purported discovery-related misconduct.  (*People v.
27     Zambrano* (2007) 41 Cal.4th 1082, 1188 [court cites lack of merit to
       prosecutorial misconduct argument as a ground for rejecting appeal of
28     ruling on new trial motion based on the same assertion of prosecutorial
       misconduct].)

(Lodgment No. 6 at 42-44.)

As in the previous claim, to the degree Ali challenges the state court's application of its own state law, he is not entitled to relief. *Estelle*, 502 U.S. at 67-68. In addition, as this Court has already concluded in Section IV(J) of this Report and Recommendation that the prosecutor did not commit misconduct; thus, a denial of a motion for a new trial based on that ground has no merit. Ali is not entitled to relief as to this claim. *Williams*, 529 U.S. at 412-13.

M. *Cumulative Error*

Finally, Ali contends the cumulative effect of all the errors that occurred in his case denied him a fair trial. (Mem. of P. & A. Supp. Am. Pet. at 102-04; Traverse at 10.) Respondent counters that there is no clearly established Supreme Court law establishing the doctrine of cumulative error, and that therefore, the claim is not cognizable on federal habeas review. (Mem. of P. & A. Supp. Answer at 42-44.) Further, Respondent contends that even if such a claim existed, Ali has failed to establish cumulative error. (*Id.* at 44.)

Ali raised this claim in the petition for review he filed in the California Supreme Court. (Lodgement No. 7.) That court denied the petition without analysis or citation of authority. (Lodgment No. 8.) Accordingly, this Court must "look through" to the state appellate court's decision denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06. That court stated that since "none of Ali's claims of error, considered separately, has merit, we reject his contention that cumulative error requires reversal. (See *People v. McWhorter*, (2009) 47 Cal.4th 318, 377.)" (Lodgment No. 6 at 49-50.)

The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000). "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle*, 505 F.3d at

927; *see also United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (stating that where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant"). Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *Frederick*, 78 F.3d at 1381 (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)). Cumulative error warrants habeas relief only where the combined effect of the errors had a "substantial and injurious effect or influence on the jury's verdict." *Parle*, 505 F.3d at 927 (quoting *Brecht*, 507 U.S. at 637).

This Court has found that none of the claims Ali presents was error. Because no errors occurred, no cumulative error is possible. *Hayes v. Ayers,* 632 F.3d 500, 523-24 (9th Cir. 2011) (stating that "[b]ecause we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible"). Accordingly, Ali is not entitled to relief for his cumulative error claim. *Williams*, 529 U.S. at 412-13.

# V.    CONCLUSION

The Court submits this Report and Recommendation to United States District Judge Cynthia A. Bashant under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d)(4) of the United States District Court for the Southern District of California.

Further, **IT IS HEREBY RECOMMENDED** that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Amended Petition for Writ of Habeas Corpus.

**IT IS ORDERED** that no later than **April 14, 2015**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **April 28, 2015**. The parties are advised that failure to file objections within the specified time may waive the right to raise those

1 objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th

2 Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

3

4 IT IS SO ORDERED.

5 DATED:  March 16, 2015

6

7 

8 Hon. William V. Gallo
  U.S. Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28