1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AHMED ALI,<br><br>Petitioner,<br><br>v.<br><br>R.T.C. GROUNDS, Warden, et al.,<br><br>Respondents. | Case No. 14-cv-00898-BAS-WVG<br><br>**ORDER:**<br><br>**(1) OVERRULING PETITIONER'S OBJECTIONS;**<br><br>**(2) ADOPTING REPORT AND RECOMMENDATION; AND**<br><br>**(3) DENYING FIRST AMENDED HABEAS PETITION** |

Petitioner Ahmed Ali brings this First Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his July 2010 conviction in San Diego County Superior Court. The matter was referred to Magistrate Judge William V. Gallo, who issued a Report and Recommendation recommending that Ali's petition be denied. Ali filed written objections. For the reasons set forth below, the Court adopts the Report and Recommendation, and denies Ali's habeas petition.

## BACKGROUND

The California Court of Appeal found the facts underlying Ali's conviction to

1   be as follows:[1]

2
3   On the night of July 22, 2008, shootings occurred at two different locations in San Diego.

4
5   The first shooting occurred around 9:30 p.m. when two men walked up to and shot at a car that was driving out of the Harbor View apartment complex. The apartment complex was known as a location where members of the Neighborhood Crip gang congregated. One witness described the apartment complex as a "war zone" between the Neighborhood Crip gang and the nearby Lincoln Park gang. Three men were riding in the targeted car, at least two of whom were affiliated with the Neighborhood Crip gang. Before shooting at the car, one of the shooters said, "What's up, cuz," with "cuz" being a term that refers to Crip gang members. Bullets struck the car, but no one in the car was shot or seriously injured. A bullet also entered a nearby residence.

6
7
8
9
10

11   The second shooting, which occurred at an apartment complex on College Avenue, was reported to police shortly before 11:00 p.m. Two men approached a group of people congregating by the stairs at the apartment complex and opened fire. Larry Lumpkin was fatally shot in the head. Maurice McElwee sustained a minor gunshot wound to his chest. Although the College Avenue apartment complex was not in any particular gang's territory, it was a common place for members of the O'Farrell Park or Skyline Piru gangs.

12
13
14
15

16   On August 7, 2008, the police received information about both shootings when a member of the Lincoln Park gang, Jesse Freeman, spoke to police after being arrested on an unrelated offense. Freeman told police that a fellow Lincoln Park gang member, Ali, claimed to have committed both of the July 22, 2008 shootings along with someone named "L" or "Lex." Freeman also gave police information about other crimes, including bank robberies, committed by different Lincoln Park gang members. Freeman made similar disclosures to police in subsequent interviews.

17
18
19
20

21   After the disclosure from Freeman, police examined the ballistics evidence from the two July 22, 2008 shootings and discovered that the same firearm was used in both incidents. Police next searched Ali's apartment and found a shell casing that was shown through forensic analysis to have been discharged from a gun that was fired at both of the July 22, 2008 shooting scenes.

22
23
24
25

26   Police arrested Ali in connection with the July 22, 2008 shootings.

27
28   _____
[1] On federal habeas review, the state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Slovik v. Yates*, 556 F.3d 747, 749 n.1 (9th Cir. 2009) (as amended). Petitioner has not challenged these findings here.

Freeman testified at a preliminary hearing held on November 14, 2008, describing Ali's admission to committing the shootings. According to Freeman's testimony, Ali told him that he carried out the shootings to "put in some work" for the Lincoln Park gang and get at members of rival gangs. Because Freeman was in danger from having testified against a fellow gang member, the police relocated Freeman to Arizona after the preliminary hearing. Freeman was found dead under a freeway overpass in Arizona on November 22, 2008, having suffered blunt force head trauma. Local police investigation into Freeman's death was inconclusive as to whether the death was a homicide, a suicide or an accident.

Ali was tried for one count of murder based on Lumpkin's death (Cal. Penal Code § 187, subd. (a)); four counts of attempted murder based on the chest wound to McElwee and the shots fired at the three victims in the car at the Harbor View apartments (§§ 187, subd. (a), 664); two counts of shooting at an inhabited structure or vehicle (§ 246); one count of being a convicted felon in possession of a firearm (former § 12021, subd. (a)(1)); and one count of unlawfully possessing a firearm (former § 12316, subd. (b)(1)). The information also alleged firearm and criminal street gang enhancements (§§ 12022.53, subds. (c), (d), (e)(1), 186.22, subd. (b)(1)).

Because Freeman was no longer alive at the time of trial, his preliminary hearing testimony was read into the record at trial. The jury also heard recordings of Freeman's interview with police.

Among the other evidence against Ali at trial was the testimony of two eye witnesses. First, one of the men who came under fire at the College Avenue apartments on July 22, 2008, testified that he picked out Ali from a photographic lineup in February 2009 as one of the shooters, stating that he was 60 to 70 percent certain at the time of the identification. Second, a teenage boy, James Gomez, who saw the shooters at the College Avenue apartments before they opened fire, identified Ali as one of the shooters.

Ali presented testimony from friends and family members, who said they were with Ali at his apartment at the time of the shootings. Defense counsel argued that instead of Ali committing the shootings, Freeman or some other Lincoln Park gang member could have committed them and could have framed Ali, or the shootings could have been committed by someone associated with a different gang.

The jury convicted Ali on all counts, and the trial court sentenced him to prison for an indeterminate prison term of 135 years to life, plus a determinate term of 60 years.

*People v. Ali*, D058357, 2013 WL 452901, at *1–3 (Cal. Ct. App. Feb. 7, 2013)

1  (unpublished).

2      Ali filed a direct appeal of his conviction in the California Court of Appeal,

3  which affirmed his conviction in an unpublished opinion dated February 7, 2013. *Id.*

4  Ali then filed a petition for review in the California Supreme Court. (ECF No. 5,

5  Attach. 45.) That Court summarily denied the petition on April 17, 2013. (ECF No.

6  5, Attach. 46.)

7      On June 9, 2014, Ali filed a First Amended Petition for Writ of Habeas Corpus

8  ("Petition") in this Court seeking habeas relief on twelve grounds.[2] (ECF No. 6.)

9  Respondents answered, and Ali filed a traverse. (ECF Nos. 10, 11.)

10     On March 16, 2015, Magistrate Judge William V. Gallo issued a Report and

11  Recommendation, pursuant to 28 U.S.C. § 636, recommending that this Court deny

12  Ali's Petition. (ECF No. 12 ("Report" or "R & R")) Among other things, the

13  magistrate judge concluded that the California Court of Appeal's adjudication of

14  Ali's claims was neither contrary to, nor an unreasonable application of, clearly

15  established federal law.

16     Ali filed written objections to the Report on April 29, 2015, arguing that it

17  erroneously resolves four of the twelve claims for relief raised in the Petition. (ECF

18  No. 15 ("Pet'r's Objs.")) Ali's four remaining claims are based on: (1) the trial court's

19  exclusion of certain hearsay statements; (2) the trial court's failure to instruct on

20  third-party culpability; (3) the trial court's exclusion of a juror affidavit to impeach

21  the verdict; and (4) cumulative error.

22                              **STANDARD OF REVIEW**

23  **A.    Review of Magistrate Judge's Report and Recommendation**

24     A district court's review of a magistrate judge's report and recommendation is

25  governed by 28 U.S.C. § 636. Under this statute, a district court must review de novo

26  "those portions of the report or specified proposed findings or recommendations to

27  _____

28  [2] Ali's First Amended Petition superseded his original Petition for Writ of Habeas Corpus filed on
    April 15, 2014.

which objection is made." 28 U.S.C. § 636(b)(1)(C). Only objections that reference specific portions of the report and recommendation will trigger de novo review— general or conclusory objections do not suffice. *See, e.g.*, *Goney v. Clark*, 749 F.2d 5, 7 (3d Cir. 1984) (finding that de novo review of magistrate's report was not required where appellant's objections were "general in nature" and "[t]here was no objection to a specific portion of the report"). Where a petitioner does not object to a report and recommendation, or to portions thereof, the district court is not required to conduct "any review at all," de novo or otherwise. *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *see also United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) ("The statute makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise."). Upon review, the district judge "may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate." 28 U.S.C. § 636 (b)(1)(C).

**B.    Federal Habeas Review**

The power of a federal court to grant habeas relief on behalf of state prisoners is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, a federal court may not grant habeas relief on any claim "adjudicated on the merits" in state court, unless the resulting decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. §§ 2254(d)(1), (d)(2). The Supreme Court has made clear that AEDPA imposes a "highly deferential" standard of review that "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (internal citation omitted).

The phrase "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court

renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). These principles are drawn from "the holdings, as opposed to the dicta," of the Supreme Court's decisions. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court's decision is "contrary to" clearly established federal law if it applies a rule that contradicts governing Supreme Court law, or if it confronts a set of facts that is "materially indistinguishable" from a decision of the Supreme Court, but reaches a different result. *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams*, 529 U.S. at 405–06). A state court decision involves an "unreasonable application" of clearly established federal law if the state court correctly identifies the governing law, but applies that law in an "objectively unreasonable" manner. *Lockyer*, 538 U.S. at 76 (citing *Williams*, 529 U.S. at 409, 413).

AEDPA deference applies only to claims that were "adjudicated on the merits" in state court. An adjudication on the merits is one "based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)). However, a state court need not explicitly analyze a federal claim for AEDPA deference to apply. The Supreme Court has held that "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Johnson v. Williams*, 568 U.S. —, 133 S. Ct. 1088, 1096 (2013). The presumption is a strong one that may be rebutted only in unusual circumstances. *Id.* at 1096.

The relevant decision for purposes of federal habeas review is the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804–06 (1991); *see also Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007) (en banc). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803. In cases of summary denial by a state's highest court, a federal habeas court "looks through" to the last reasoned state court decision to address the

1   claim at issue. *Id*. at 804–06. Here, the California Supreme Court summarily denied

2   Ali's petition for review, and so the Court "looks through" to the California Court of

3   Appeal's unpublished written decision as the appropriate decision for review. *See*

4   *Medley*, 506 F.3d at 862.

5                    **DISCUSSION**

6       Ali's First Amended Petition contained twelve grounds for habeas relief.

7   Following Magistrate Judge Gallo's Report and Recommendation, and Ali's

8   objections to that Report, only four claims remain in dispute. In his remaining claims,

9   Ali asserts violations of his federal constitutional rights based on: (1) the trial court's

10   exclusion of critical and reliable hearsay; (2) the trial court's failure to instruct the

11   jury on third-party culpability; (3) the trial court's exclusion of a juror affidavit to

12   impeach the verdict; and (4) cumulative error. The Court reviews the magistrate

13   judge's resolution of these claims de novo. 28 U.S.C. § 636(b)(1)(C).

14   **A.**    **Right to Present a Defense**

15       Ali contends that the trial court's exclusion of hearsay statements by Marcus

16   House and Hunter Porter violated his federal right to present a defense under

17   *Chambers v. Mississippi*, 410 U.S. 284 (1973). (Pet'r's Objs. 2–10.) Ali also presents

18   a threshold argument that the California Court of Appeal did not adjudicate his

19   *Chambers* claim on the merits, and therefore AEDPA deference does not apply to

20   this claim. The magistrate judge found that the California Court of Appeal did

21   adjudicate Ali's *Chambers* claim on the merits, and that its resolution of the claim

22   was neither contrary to, nor an unreasonable application of, clearly established

23   federal law. (R & R 11–13, 20.)

24          **1.**    **Adjudication on the Merits**

25       The Court first addresses Ali's objection that the California Court of Appeal

26   did not address his right to present a defense claim on the merits. On direct appeal,

27   Ali claimed that the trial court's exclusion of House and Porter's hearsay statements

28   violated both California Evidence Code § 1230 and Ali's right to present a defense

1   under *Chambers*. The court of appeal expressly addressed the state law claim, but

2   was silent on the *Chambers* claim. *See Ali*, 2013 WL 452901, at *10–12.

3         A state court need not expressly address a federal claim for AEDPA deference

4   to apply. "When a state court rejects a federal claim without expressly addressing that

5   claim, a federal habeas court must presume that the federal claim was adjudicated on

6   the merits." *Williams*, 133 S. Ct. at 1096.[3] The presumption "is a strong one that may

7   be rebutted only in unusual circumstances," for example when the relevant state

8   standard is "less protective" than, or "quite different" from, the federal standard. *Id*.

9         Ali argues that the *Williams* presumption has been rebutted here because the

10  state court expressly treated his federal right to present a defense claim as a state law

11  claim. (Pet'r's Objs. 2:1–4:6.) The magistrate judge concluded the presumption had

12  not been rebutted, in part because he found that the relevant state law standard

13  subsumed the federal standard. (R & R 12:4–9.) The Court agrees with the magistrate

14  judge.

15        A comparison of the relevant standards shows why the *Williams* presumption

16  holds in this case. The state law claim at issue was brought under Cal. Evid. Code §

17  1230, which, as pertinent here, provides for the admission of hearsay statements that

18  qualify as declarations against penal interest. For admission under § 1230, a statement

19  must be "distinctly against" the declarant's interest and must be "clothed with indicia

20  of reliability." *People v. Duarte*, 12 P.3d 1110, 1117 (Cal. 2000). The standard under

21  *Chambers* is similar: hearsay statements that are critical to the defense may not be

22  excluded as hearsay when the statements were made "under circumstances that

23  provided considerable assurance of their reliability." *Chambers*, 410 U.S. at 300–01.

24  California courts have treated the *Chambers* standard and the § 1230 standard—

25  particularly their shared emphasis on "reliability"—as generally coextensive. *See*

26  *People v. Butler*, 209 P.3d 596, 610 (Cal. 2009)  ("The same lack of reliability that

27

28  [3] References to *Williams* in this section are to *Johnson v. Williams*, 568 U.S. —, 133 S. Ct. 1088 (2013), rather than *Williams v. Taylor*, 529 U.S. 362 (2000), another important AEDPA case.

makes . . . statements excludable under [California] state law makes them excludable under the federal Constitution.") (citations omitted); *People v. Dixon*, 63 Cal. Rptr. 3d 637, 650 (Ct. App. 2007) (holding there is no constitutional error where the trial court properly excludes evidence as unreliable under section 1230). Put another way, the state law rule under § 1230 "is at least as protective" as the relevant federal standard, and therefore "the federal claim may be regarded as having been adjudicated on the merits." *Williams*, 133 S. Ct. at 1096 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)).

Ali does not argue otherwise, but emphasizes that the state court addressed only his state-law claim while not acknowledging his separate federal claim. But this assertion only begs, rather than answers, the question whether the presumption has been rebutted. Where, as here, "a state court rejects a federal claim without expressly addressing that claim," this Court "*must* presume that the federal claim was adjudicated on the merits[.]" *Id.* at 1096 (emphasis added). Ali's observation that the state court was silent is little more than an acknowledgment of the conditions that trigger the presumption, rather than evidence sufficient to rebut it.

Here, the Court finds that the state standard provided in Cal. Evid. Code § 1230 is at least as protective as the federal standard provided in *Chambers*. Therefore, the California Court of Appeal's adjudication of Ali's claim under § 1230 effectively addressed Ali's counterpart federal claim under *Chambers*. Accordingly, the Court applies AEDPA deference to Ali's *Chambers* claim.

## 2. Legal Standard for *Chambers* Claim

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations omitted) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). In *Chambers*, the Supreme Court established that the right to present a

defense may be abridged when a court excludes hearsay evidence that is reliable and critical to the defendant's case. *Chambers*, 410 U.S. at 302. In so holding, the Court explained that although criminal defendants must comply with established rules of evidence designed to facilitate the criminal trial process, these rules "may not be applied mechanistically to defeat the ends of justice." *Id*. On a *Chambers* claim, then, the last word belongs not to state law, but to the Federal Constitution. *Kubsch v. Neal*, 838 F.3d 845, 853–54 (7th Cir. 2016); *see also Lunberry v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) ("[D]epending on the facts and circumstances of the case, at times a state's rules of evidence . . . must yield in favor of due process and the right to a fair trial.") (citing *Chambers*, 410 U.S. at 302).

In determining whether application of a state evidentiary rule violates federal due process under *Chambers*, the Ninth Circuit employs a balancing test, weighing the reliability and importance of the evidence against the State's interest in exclusion. *See Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)). In evaluating reliability and importance, courts consider five overlapping factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Id*. These factors are then weighed against "the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable . . . evidence." *Miller*, 757 F.2d at 995 (quoting *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983)); *see also United States v. Scheffer*, 523 U.S. 303, 308 (1998) ("[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."). In general, there must be "unusually compelling circumstances . . . to outweigh the strong state interest in administration of its trials." *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2008) (quoting *Perry*, 713 F.2d at 1452); *see also Nevada v. Jackson*, 569 U.S. —, 133 S. Ct. 1990, 1992 (2013) (per curiam) ("Only rarely

1   have we held that the right to present a complete defense was violated by the
2   exclusion of defense evidence under a state rule of evidence.") (citations omitted).

3       **3.    House's Statements**

4       The Court's analysis begins with statements made by Marcus House to a
5   defense investigator. House, a Lincoln Park gang member, told a defense investigator
6   that: (1) Freeman, a fellow Lincoln Park gang member, told House that he had
7   committed the College Avenue shooting with another person known as "L"; (2)
8   Freeman explained to House how the shooting occurred; and (3) House had
9   previously given Freeman a nine millimeter handgun, the same caliber weapon used
10  in the shooting. (ECF No. 5, Attach. 5 at 77, 173.)

11      House refused to testify, and the trial court excluded his statements to the
12  defense investigator as hearsay. *See Ali*, 2013 WL 452901, at *10. The California
13  Court of Appeal determined that the trial court's exclusion of these statements was
14  not an abuse of discretion, and the magistrate judge concluded that this determination
15  was neither contrary to, nor an unreasonable application of, clearly established
16  federal law. Ali objects, arguing that House's statements were reliable and critical
17  under *Chambers*, and that exclusion of the statements violated Ali's right to present
18  a defense. (Pet'r's Objs. 5:3–8:9.)

19      As an initial matter, the Court notes that at least some of the *Miller* factors used
20  to evaluate a *Chambers* claim tend to weigh in favor of admission: House's
21  statements were probative (to some degree) of the central issue of whether Ali
22  committed the College Avenue shooting; the statements were the sole direct evidence
23  implicating Freeman in the shootings; and the statements would have been a major
24  part of Ali's defense. However, as explained below, House's statements were neither
25  against his interest nor sufficiently reliable to require admission under *Chambers*.[4]

26

27  [4] Given the Court's determination that House's statements were not sufficiently reliable for
28  admission under *Chambers*, the Court need not resolve definitively whether the statements were
    capable of evaluation by the jury. It will suffice to say that given House's refusal to testify, it is

a.      **Declarations against Interest**

California Evidence Code § 1230 permits the admission of hearsay statements that qualify as declarations against the speaker's penal interest. Under § 1230, a hearsay statement will not be made inadmissible by the hearsay rule "if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected [the declarant] to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." Cal. Evid. Code § 1230. To satisfy § 1230, a declaration must be "distinctly against" the declarant's penal interest and must be "clothed with indicia of reliability." *Duarte*, 12 P.3d at 1117; *People v. Shipe*, 122 Cal. Rptr. 701, 708 (Ct. App. 1975); *see also Chambers*, 410 U.S. at 300–01 (declarations against interest that are critical to the defendant must be admitted when the declarations are "in a very real sense self-incriminatory and unquestionably against interest" and are made "under circumstances that provided considerable assurance of their reliability"). In evaluating whether a statement qualifies as a declaration against interest, courts should "take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." *People v. Frierson*, 808 P.2d 1197, 1205 (Cal. 1991) (en banc). "Whether a statement is self-inculpatory or not can only be determined by viewing the statement in context." *People v. Lawley*, 38 P.3d 461, 497 (Cal. 2002) (citing *Williamson v. United States*, 512 U.S. 594, 603 (1994)).

Ali argues that House's statements were reliable under *Chambers* because they

---

doubtful the jury could have properly evaluated his statements. Ali argues that the defense investigator could have testified about House's statements, and that the State's cross-examination of the investigator could have provided the jury a means of evaluating House's credibility and demeanor. The Court finds this argument dubious for the simple reason that it would have the defense investigator make credibility determinations—a function that falls within the exclusive province of the jury. *See Donoghue v. Orange County*, 848 F.2d 926, 933 (9th Cir. 1987) ("Credibility determinations are within the exclusive province of the jury.") (citations omitted). It is House's credibility and demeanor that matter for purposes of jury evaluation, not the investigator's opinion about House's credibility and demeanor.

were declarations against House's penal interest. (Pet'r's Objs. 5:24–6:22.) In support of this argument, Ali contends that House's statements either implicated him in the College Avenue shooting specifically, or in gang activity more generally. The Court disagrees.

Ali's main argument is that House's statement that he gave Freeman a nine millimeter handgun prior to Freeman committing the College Avenue shooting exposed House to criminal liability. But this statement is not "distinctly against" House's penal interest. There was no evidence that the handgun House claims to have given Freeman was the same gun used in the shooting. More importantly, House did not say he gave Freeman the gun with knowledge that it would be used to carry out the shooting, which might have subjected House to aider and abettor liability. *See, e.g.*, *People v. Prettyman*, 926 P.2d 1013, 1018 (Cal. 1996) ("To prove that a defendant is an accomplice . . . the prosecution must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'") (quoting *People v. Beeman*, 674 P.2d 1318, 1325 (Cal. 1984) (citations omitted)). Rather, House's statement primarily bolsters his claims about *Freeman's* alleged involvement in the shooting. The fact that House never directly inculpates himself in a crime, while at the same time asserting Freeman's involvement, substantially undermines the extent to which the statement can be viewed as against House's interest. *See, e.g.*, *Duarte*, 12 P.3d at 1116 ("[W]e have declared section 1230's exception to the hearsay rule 'inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant.'") (quoting *People v. Leach*, 541 P.2d 296, 311 (Cal. 1975)). In addition, House was already serving a 20-year prison sentence at the time he made the statements and had been charged with several bank robberies. *See Ali*, 2013 WL 452901, at *8. He had little to lose by telling the defense investigator he gave Freeman the same type of gun used in the shooting. Thus, under these circumstances,

the Court finds that House's statements did not run distinctly against his penal interest. *See Duarte*, 12 P.3d at 1115 ("[T]hat a hearsay statement may be facially inculpatory or neutral cannot always be relied upon to indicate whether it is 'truly self-inculpatory, rather than merely [an] attempt[] to shift blame or curry favor.'") (quoting *Williamson*, 512 U.S. at 603); *People v. Traylor*, 100 Cal. Rptr. 116, 120 (Ct. App. 1972) ("The test here is not whether the statement could provide a link in a chain of evidence leading to the declarant's liability, but whether the statement . . . was 'distinctly' against his own penal interest.").

Ali contends that even if House's statement about giving Freeman the handgun was not a declaration against interest, House's other statements qualified as such because they implicated him in gang activity that could have been used to prove the gang allegations in his bank robbery case. (Pet'r's Objs. 6:5–22.) This argument is unpersuasive. To prove a gang allegation under California Penal Code § 186.22(b)(1), the prosecution must show that a defendant committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang," and "with the specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b)(1); *see also People v. Gardeley*, 927 P.2d 713, 720 (Cal. 1996), *disapproved of on other grounds by People v. Sanchez*, 374 P.3d 320 (Cal. 2016). House's statements to the defense investigator—i.e., that House is a member of Lincoln Park; that he and Freeman communicated; that he gave Freeman the same type of handgun used in the College Avenue shooting—do not show that House committed bank robberies "for the benefit of, at the direction of, or in association with" a gang and with the "specific intent" to facilitate criminal conduct by gang members. Cal. Penal Code § 186.22(b)(1); *People v. Albillar*, 244 P.3d 1062, 1076 (Cal. 2010) ("The enhancement set forth in section 186.22(b)(1) does not risk conviction for mere nominal or passive involvement with a gang. . . . Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang."). At most, House's statements

– 14 –

1  confirm his membership in Lincoln Park. This is insufficient to support a gang

2  enhancement under § 186.22(b)(1). *See People v. Ochoa*, 102 Cal. Rptr. 3d 108, 114

3  (Ct. App. 2009) ("The record must provide some evidentiary support, other than

4  merely the defendant's record of prior offenses and past gang activities or personal

5  affiliations, for a finding that the crime was committed for the benefit of, at the

6  direction of, or in association with a criminal street gang.") (citation omitted); *People*

7  *v. Ortiz*, 67 Cal. Rptr. 2d 126, 128 (Ct. App. 1997) ("For a gang enhancement to be

8  found true, there must be substantial evidence supporting [the] finding[.]").

9  Therefore, the Court finds that the gang allegations in House's bank robbery case did

10  not render his statements to the defense investigator declarations against interest.

11  Ali stresses that House's decision to invoke his Fifth Amendment right and

12  refuse to testify is clear evidence that his statements were against his penal interest.

13  (Pet'r's Objs. 6.) The Court disagrees. Even if House's attorney believed that House

14  taking the stand could lead to a line of questioning that might incriminate him, this

15  does not mean that House considered the statements to have been against his interest

16  *at the time he made them*. *See* Cal. Evid. Code § 1230. To some extent, the

17  circumstances suggest the opposite: the fact that House originally told defense

18  counsel he would testify (before being advised otherwise by counsel) suggests he

19  perceived little risk in doing so. Thus, while House's refusal to testify may speak to

20  his litigation strategy in his bank robbery case, or a newfound appreciation for the

21  perils of cross-examination, it by no means compels the conclusion that the

22  statements were against House's interest at the time he made them. *See, e.g.*, *Traylor*,

23  100 Cal. Rptr. at 120 ("The test here is not whether the statement could provide a link

24  in a chain of evidence leading to the declarant's liability, but whether the statement .

25  . . was 'distinctly' against his own penal interest.").

26  In sum, the Court finds that House's statements to the defense investigator do

27  not qualify as declarations against House's penal interest.

28  **b.    Indicia of Reliability**

1     The Court has found that House's statements did not constitute declarations
2     against interest. However, even assuming *arguendo* that House's statements were
3     against his interest, the statements still lack sufficient indicia of reliability such that
4     *Chambers* requires admission. There are several reasons for this.

5     First, House had a strong motive to incriminate Freeman, a Lincoln Park gang
6     member who had become a police informant, and exonerate Ali, a Lincoln Park gang
7     member who was apparently in good standing. Given Freeman's violation of the
8     norms generally believed to govern gang membership, House's statements may have
9     been nothing more than an effort to pin the shooting on someone who was perceived
10    to have turned his back on his gang. *See Frierson*, 808 P.2d at 1205 ("The decision
11    whether trustworthiness is present [under section 1230] requires the court to apply to
12    the peculiar facts of the individual case a broad and deep acquaintance with the ways
13    human beings actually conduct themselves in the circumstances material under the
14    exception.") (citation omitted); Michael L. Rich, *Lessons of Disloyalty in the World
15    of Criminal Informants*, 49 Am. Crim. L. Rev. 1493, 1518–19 (2012) ("[T]here is a
16    normative expectation that members of [a criminal] community will not reveal
17    incriminating information about other members to the police, particularly when
18    motivated purely by self-interest. In breaching that expectation, the criminal-
19    informant thus commits an act of disloyalty to the community of criminals.").

20    Second, House was aware that Freeman was dead at the time he spoke to the
21    defense investigator. (ECF No. 5, Attach. 5 at 77.) This suggests House knew he
22    could attribute statements to Freeman without being contradicted or subjected to
23    retaliation. The fact that there was no real risk that House's account would be
24    challenged reduced any pressure on House to speak truthfully. Under these
25    circumstances, the benefits of shifting the blame for the shooting from Ali to Freeman
26    almost certainly outweighed any potential costs.

27    Finally, House's statements were not corroborated by any other evidence in
28    the case. This lack of corroboration stands in stark contrast to the circumstances

surrounding the hearsay confessions at issue in *Chambers*. In *Chambers*, the Supreme Court emphasized there were multiple forms of corroborating evidence that made the excluded hearsay sufficiently reliable, including a separate sworn confession, the testimony of an eyewitness to the shooting, testimony that the individual who confessed was seen with a gun immediately after the shooting, and the "sheer number of independent confessions." *Chambers*, 410 U.S. at 300–01; *see also Christian v. Frank*, 595 F.3d 1076 (9th Cir. 2010) (explaining that under *Chambers*, the reliability of a hearsay confession is assessed by "the amount and quality of the evidence corroborating the testimony about the confession[]"). Here, however, there were no other witnesses linking Freeman to the shooting, no indication that Freeman confessed his alleged involvement in the shooting to anyone else, and generally no evidence to corroborate House's account of Freeman's statements. Absent such corroboration, House's statements lacked the "persuasive assurances of trustworthiness" present in *Chambers*. *Chambers*, 410 U.S. at 302.

For these reasons, the Court finds that House's statements were not sufficiently reliable to require admission under *Chambers*.[5]

### 4.      Porter's Statements

The Court turns now to statements made by Hunter Porter during a "free talk" with the District Attorney's ("DA") office. Porter told the DA's office that: (1) he and Freeman had participated in several bank robberies together and that Freeman

---

[5] Ali argues that the Ninth Circuit in *Lunbery v. Hornbeak*, 605 F.3d 754 (9th Cir. 2010), granted federal habeas relief on a claim "materially indistinguishable" from his. (Pet'r's Objs. 7:23–8:9.) The Court disagrees with Ali's characterization of *Lunbery*. In *Lunbery*, the Ninth Circuit determined that the excluded hearsay—a statement in which the declarant admitted knowledge of the murderers and of their mistake in killing the wrong person—was against the declarant's penal interest, and found that it was corroborated by other evidence in the case. *Id.* at 761. The *Lunbery* court also emphasized that the hearsay statement was made spontaneously and shortly after the murder. Here, however, House's statements were not against his penal interest, nor corroborated by other evidence. Further, the statements were not made spontaneously and shortly after the crime, but rather almost two years later in response to a defense investigator's request for an interview. Thus, Ali's reliance on *Lunbery* is unavailing.

had lied to law enforcement when he told them he had never robbed a bank; (2) Freeman took more than his share of proceeds from one of the bank robberies, leaving other participants in the crime with a smaller share; and (3) unspecified portions of the police report recounting Freeman's interview with law enforcement were "wrong." (ECF No. 5, Attach. 29 at 6.)

Porter refused to testify, and the trial court excluded his statements as hearsay. *See Ali*, 2013 WL 452901, at *10. The California Court of Appeal determined that the trial court's exclusion of the statements was not an abuse of discretion, and the magistrate judge concluded that this determination was neither contrary to, nor an unreasonable application of, clearly established federal law. (R & R 20.) Ali objects, arguing that the statements were declarations against Porter's penal interest, and thus reliable under *Chambers*. Ali stresses that the statements could have been used to impeach Freeman's credibility, which in turn would have cast doubt on Freeman's claim that Ali committed the July 22, 2008 shootings. (Pet'r's Objs. 8:10–10:23.)

The Court assumes without deciding that Porter's statements, in which he admits to participating in multiple bank robberies, were declarations against interest. However, it is not enough that a hearsay statement run against the declarant's penal interest for the statement to be admitted; the statement must also be "clothed with indicia of reliability." *Duarte*, 12 P.3d at 1117; *see also Chambers*, 410 U.S. 300–01 (holding that hearsay statements that are critical to the defendant may not be excluded as hearsay when the statements are made "under circumstances that provided considerable assurance of their reliability"). That was not the case here.

First, Porter was a Lincoln Park gang member who, like House, had a strong incentive to discredit disfavored gang member Freeman, while helping Ali. Second, Porter told the DA's office that "he'd heard rumors" Freeman was dead, suggesting that Porter, like House, believed he could discredit Freeman without risk of contradiction or retaliation. (ECF No. 5, Attach. 29 at 6.) Finally, the fact that Porter went to the DA's office on his own accord to review Freeman's statements to law

enforcement is strong evidence that Porter saw a benefit to doing so. Porter's initiative is a far cry from the circumstances under which declarations against interest are considered to be especially reliable—such as where "the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures," *People v. Greenberger*, 68 Cal. Rptr. 2d 61, 81 (Ct. App. 1997) (citations omitted), or where the declarant stands to "benefit nothing" by the statements, *Chambers*, 410 U.S. at 301. Here, Porter had plenty of reasons to talk to the DA's office about Freeman, whether it be to downplay Porter's role in the bank robberies, punish Freeman for his disloyalty to Lincoln Park, help exonerate Ali, or a combination of all three. Under these circumstances, the Court finds that Porter's statements were not made "under circumstances that provided considerable assurance of their reliability" such that *Chambers* required admission. *Id*. at 300.

Further, even if Porter's statements should have been admitted, the trial court's exclusion of the statements did not prejudice Ali. On federal habeas review, a constitutional error at trial will warrant relief only where the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993). Here, the value to the defense of Porter's statements was to call into question Freeman's credibility. However, evidence impeaching Freeman's credibility was admitted at trial through, among other witnesses, Tiano Durham. Durham, a Lincoln Park gang member, testified that he and Freeman robbed a bank together in 2007, even as Freeman later told law enforcement he had never robbed a bank. (ECF No. 5, Attach. 34 at 78, 79.) Durham also testified that on several occasions he provided Freeman with materiel and supplies to commit robberies, and that Freeman did in fact carry out such crimes. (*Id*. at 79, 80.) Therefore, Porter's statements impeaching Freeman were cumulative of other evidence already before the jury, and so did not seriously undermine Ali's defense. *See, e.g.*, *Villescas v. Hernandez*, 163 F. App'x 612, 613 (9th Cir. 2006) (finding that the trial court's exclusion of evidence did not have a "substantial and

1    injurious effect" on the jury's verdict where the evidence "would have been
2    cumulative, and would have merely bolstered identical testimony offered at trial");
3    *Averilla v. Lopez*, 862 F. Supp. 2d 987, 994 (N.D. Cal. 2012) ("If the evidence [sought
4    to be admitted on a right to present a defense claim] is considered cumulative, then
5    its exclusion did not result in a constitutional violation and no harmful error
6    occurred."). The jury could have drawn the same inference from the Durham
7    testimony that the defense sought to support by offering Porter's statements—
8    namely, that Freeman was not credible and so may have lied about Ali committing
9    the July 22, 2008 shootings. Accordingly, the Court finds that even if the trial court
10   erred in excluding Porter's statements, that error did not have a "substantial and
11   injurious effect" on the jury's verdict.[6] *Brecht*, 507 U.S. at 638.

12   *   *   *

13        The Court finds that the trial court's exclusion of hearsay statements by House
14   and Porter did not violate Ali's right to present a defense. House's statements were
15   not distinctly against his penal interest, and the circumstances surrounding the
16   statements did not provide sufficient assurance of their reliability. Porter's statements
17   may have been against his interest, but the circumstances were such that Porter, like
18   House, had a strong incentive to discredit Freeman. Thus, in this case, the importance
19   of the excluded statements did not outweigh the legitimate and substantial state
20   interest in excluding unreliable evidence.[7] *See Alcala v. Woodford*, 334 F.3d 862, 877

21

22   [6] Another interpretation of Porter's statements is that they were not "critical" to Ali's defense under
23   *Chambers*. In *Chambers*, the Supreme Court found the hearsay confessions at issue critical because
     Chambers' defense was "far less persuasive" than it would have been had the confessions been
24   admitted. *Id.* at 294. In this case, however, whether Porter's statements were admitted or excluded,
     the jury's perception of Freeman would have been substantially the same. Thus, Porter's statements
25   were not essential to Ali's ability to present a defense.

26   [7] The Court notes that Ali attempts to reduce the balancing test in *Miller* to a purely numerical
27   exercise whereby the presence of a majority of the factors weighing in favor of admission is
     sufficient to require admission under *Chambers*. (Pet'r's Objs. 7:16–22.) This approach is
28   unwarranted. The *Miller* factors are not meant to be standalone variables with pre-assigned
     "values," but rather to provide a means of assessing whether evidence is critical and reliable under

1   (9th Cir. 2003) ("While 'the right to present a defense is fundamental,' 'the state's

2   legitimate interest in reliable and efficient trials is also compelling.'") (quoting *Perry*,

3   713 F.2d at 1450–51); *Miller*, 757 F.2d at 995 (citing *Perry*, 713 F.2d at 1452–53).

4   The California Court of Appeal's denial of this claim was neither contrary to, nor an

5   unreasonable application of, clearly established federal law. Accordingly, Ali is not

6   entitled to habeas relief on this claim.

7   **B.    Failure to Instruct on Third-Party Culpability**

8       Ali argues that the trial court violated his due process and fair trial rights when

9   it refused to give the jury a pinpoint instruction on third-party culpability. The

10  California Court of Appeal denied this claim, and the magistrate judge concluded that

11  this decision was neither contrary to, nor an unreasonable application of, clearly

12  established federal law. (R & R 27.) Ali objects, arguing that the evidence was

13  sufficient under governing Supreme Court law to require the trial court to give the

14  requested instruction. (Pet'r's Objs. 11–13.)

15      "As a general proposition a defendant is entitled to an instruction as to any

16  recognized defense for which there exists evidence sufficient for a reasonable jury to

17  find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (citing *Stevenson*

18  *v. United States*, 162 U.S. 313 (1896)). "This is so because the right to present a

19  defense 'would be empty if it did not entail the further right to an instruction that

20  allowed the jury to consider the defense.'" *Bradley v. Duncan*, 315 F.3d 1091, 1099

21  (9th Cir. 2002) (quoting *Tyson v. Trigg*, 50 F.3d 436, 448 (7th Cir. 1995)).

22      To obtain relief on an instructional error claim, a petitioner must show that the

23

24  _____

*Chambers*. This means that it is not the number of *Miller* factors that matters, but whether

25  consideration of those factors, overall, demonstrates that federal due process requires admission of the excluded evidence. It is entirely possible for a court to find a majority of the *Miller* factors

26  satisfied (for example, high probative value, sole evidence on the issue, and major part of the defense), but still find that the evidence was properly excluded because it was unreliable. The

27  analysis is qualitative, not arithmetic. *See Perry*, 713 F.2d at 1453 ("Due process draws a boundary beyond which state rules cannot stray; it does not displace the law of evidence with a constitutional

28  balancing test.").

error "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Where, as here, the alleged error is failure to give an instruction, a petitioner's burden is "especially heavy" because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In assessing whether failure to give an instruction violates federal due process, courts consider "the evidence in the case" and the "overall instructions given to the jury." *Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995) (citing *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)). "It is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory." *United v. Dees*, 34 F.3d 838, 842 (9th Cir. 1994) (citation omitted).

Ali requested the following instruction on third-party culpability:

> You have heard evidence that a person other than the defendant may have committed the offense with which the defendant is charged. The defendant is not required to prove the other person's guilt beyond a reasonable doubt. Defendant is entitled to an acquittal if the evidence raises a reasonable doubt in your minds as to the defendant's guilt. Such evidence may by itself raise a reasonable doubt as to the defendant's guilt. However, its weight and significance, if any, are matters for your determination. If after consideration of this evidence, you have a reasonable doubt that the defendant committed this offense, you must give the defendant the benefit of the doubt and find [him][her] not guilty.

(ECF No. 5, Attach. 6 at 152.)

Ali points to four pieces of evidence to support the argument that his proposed instruction was constitutionally required: (1) a witness named Canute Dawes testified that the College Avenue shooting may have been committed by Crip gang members in retaliation for an earlier altercation between Dawes and a female Crip gang associate; (2) witnesses testified that before the Harbor View shooting one of the shooters used a Crips' greeting ("What's up, cuz") before firing; (3) there was evidence that Freeman had no alibi during the time of the Harbor View shooting; and (4) there was testimony that Freeman regularly visited and occasionally spent nights at Ali's apartment and so had an opportunity to plant the shell casing that police found

1    in Ali's bedroom. (Pet'r's Objs. 12.) Ali contends that given this evidence, the trial

2    court's failure to instruct the jury on third-party culpability was contrary to *Mathews*.

3           The Court finds Ali's argument unpersuasive. None of the evidence pointed to

4    by Ali, taken alone or together, sufficiently links a third party to the shootings such

5    that due process required the trial court to give Ali's proposed instruction. *Mathews*,

6    485 U.S. at 63 ("[A] defendant is entitled to an instruction as to any recognized

7    defense for which there exists evidence *sufficient* for a reasonable jury to find in his

8    favor.") (emphasis added). Although some of the evidence suggests a possible motive

9    by Crip gang members, and possible opportunity by Freeman, evidence of possible

10   motive and opportunity by a third party, without more, is insufficient to raise a

11   reasonable doubt as to Ali's guilt. *See Flores v. McDonald*, No. 1:10–cv–02234–

12   LJO–JLT, 2013 WL 5934340, at *7 (E.D. Cal. Nov. 5, 2013) ("Before an instruction

13   on third party culpability may properly be given, there must be substantial evidence

14   capable of raising a reasonable doubt about the defendant's guilt, and there must be

15   direct or circumstantial evidence linking the third party to the crime."); *People v.*

16   *Prince*, 156 P.3d 1015, 1061 (Cal. 2007) ("Evidence of mere motive and opportunity

17   to commit the crime in another person, without more, will not suffice to raise a

18   reasonable doubt about a defendant's guilt: there must be direct or circumstantial

19   evidence linking the third person to the actual perpetration of the crime.") (quoting

20   *People v. Robinson*, 124 P.3d 363, 385 (Cal. 2005)). Other evidence cited by Ali—

21   e.g., the use of a Crips' greeting by one of the shooters and Freeman's regular visits

22   and occasional overnight stays at Ali's apartment—was speculative in its

23   implications, and thus had little probative force. *See, e.g.*, *Spivey v. Rocha*, 194 F.3d

24   971, 978 (9th Cir. 1999) (characterizing evidence of third-party culpability as "purely

25   speculative" where it did not "link any third party to the [crime], or establish an actual

26   motive rather than a possible or potential motive"). Thus, because the evidence was

27   insufficient to raise a reasonable doubt about Ali's guilt, the trial court was not

28   required to give the proposed instruction under *Mathews*. *See, e.g.*, *Morales v.*

1    *Barnes*, No. CV 12–4219–MMM (DTB), 2013 WL 4832713, at \*6–7 (C.D. Cal. Sept.

2    10, 2013) (evidence that a third party had motive and opportunity to shoot the victim

3    was insufficient to warrant a jury instruction on third party culpability where

4    evidence did not plausibly connect third party to the shooting). The California Court

5    of Appeal's denial of this claim was neither contrary to, nor an unreasonable

6    application of, clearly established federal law.

7         Ali argues that *Mathews* requires only the existence of "some evidence" of

8    third-party culpability to require the relevant jury instruction. Citing *Stevenson v.*

9    *United States*, 162 U.S. 313 (1896), a 19th-century Supreme Court case on which the

10   *Mathews* holding is based, Ali argues that a defense-theory instruction must be given

11   "so long as there is some evidence upon the subject[.]" *Stevenson*, 162 U.S. at 314.

12        The Court finds no inconsistency between *Mathews* and *Stevenson*. Although

13   *Mathews* employs more precise language in outlining the governing legal principle,

14   the language from *Stevenson* cited by Ali reflects the circumstances of that case rather

15   than a more liberal legal standard. Indeed in *Stevenson*, where the issue was whether

16   the trial court erred in refusing to give a jury instruction on manslaughter, the Court

17   explained that the relevant question was whether there was "enough" evidence "to

18   require the submission of the question of manslaughter to a jury." *Id*. at 319. This is

19   entirely consistent with the standard in *Mathews* that there be "evidence sufficient for

20   a reasonable jury to find in [defendant's] favor." *Mathews*, 485 U.S. at 63. Under

21   either case, the evidence here was insufficient because it did not connect a third-party

22   to the shootings with which Ali had been charged. Thus, Ali's reliance on a supposed

23   discrepancy between *Mathews* and *Stevenson* is unavailing.

24        The Court also finds that the overall charge to the jury rendered a separate

25   instruction on third-party culpability unnecessary. The trial court instructed the jury

26   with CALCRIM No. 220, the standard reasonable doubt instruction, which stated in

27   part:

28        A defendant in a criminal case is presumed to be innocent. This

– 24 –

presumption requires that the People prove a defendant guilty beyond a reasonable doubt. . . .

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

(ECF No. 5, Attach. 6 at 160.)

This reasonable doubt instruction, along with others given to the jury,[8] properly explained the presumption of innocence, the State's burden of proof, and the meaning of reasonable doubt. Ali's proposed instruction, which merely reframes the burden of proof around evidence of third party culpability, was essentially duplicative—it added nothing material to the jury's understanding of its duty in assessing Ali's guilt. Indeed, defense counsel argued its third-party culpability theory at length at closing argument, explaining to the jury its belief that evidence of third-party culpability prevented the State from carrying its burden of proof. (ECF No. 5, Attach. 35 at 118–47.) This was sufficient to cover Ali's defense theory. *See People v. Hartsch*, 232 P.3d 663, 692 (Cal. 2010) ("It is hardly a difficult concept for the jury to grasp that acquittal is required if there is reasonable doubt as to whether someone else committed the charged crimes."). Under these circumstances, the Court finds the trial court was not required to given an additional instruction on third-party culpability. *See United States v. Del Toro-Barboza*, 673 F.3d 1136, 1147 (9th Cir. 2012) ("[A] court may reject a defendant's requested instruction if other instructions reasonably

---

[8] For example, CALCRIM No. 315, the instruction on eyewitness identification, restated that the People had the burden to prove Ali's guilt beyond a reasonable doubt. (ECF No. 5, Attach. 6 at 172–73.) In addition, CALCRIM No. 373 instructed the jury that "[t]he evidence shows that another person may have been involved in the commission of the crime[s] charged against the defendant," and that their "duty [was] to decide whether the defendant on trial here committed the crimes charged." (*Id*. at 184.)

cover the theory of the defense."); *Gonzales v. Virga*, No. 1:11–CV–02122 LJO GSA HC, 2012 WL 6004520, at *23 (E.D. Cal. Nov. 30, 2012) (finding the trial court's failure to instruct on third party culpability harmless where "the jury was instructed on the burden of proof and reasonable doubt, and the jury was well aware of the defense theory based on defense counsel's arguments").

In sum, the Court finds that the California Court of Appeal's denial of Ali's instructional error claim was neither contrary to, nor an unreasonable application of, clearly established federal law. The evidence did not sufficiently link a third party to the shootings, and the instructions as a whole adequately covered Ali's defense theory. Accordingly, Ali is not entitled to habeas relief on this claim.

## C. Juror Misconduct and Admissibility of Juror Affidavit

Ali argues that his due process and jury trial rights were violated by juror misconduct, and that the trial court should have admitted a declaration by Juror 5 as part of the inquiry into the verdict's fairness.[9] In his declaration, Juror 5 attests that at the outset of deliberations Juror 6 told fellow jurors that "he was voting for guilt [because] he figured the District Attorney knew what he was doing," and that if the DA "had enough evidence to say [Ali] was guilty, then he must be guilty." (ECF No. 5, Attach. 6 at 275.) The California Court of Appeal found this portion of Juror 5's declaration to be inadmissible, and the magistrate judge concluded this determination was neither contrary to, nor an unreasonable application of, clearly established federal law. Ali objects, arguing that Juror 6's statement was admissible under Federal Rule of Evidence 606(b), and that even if the statement was properly excluded under Rule 606(b), admission was compelled by governing Supreme Court law in *Warger v. Shauers*, 574 U.S. —, 135 S. Ct. 521 (2014), and *Irvin v. Dowd*, 366 U.S. 717 (1961).

---

[9] Although Ali's First Amended Petition sought admission of other juror declarations to impeach the verdict, Ali's Objections challenge only the magistrate judge's conclusion on the admissibility of Juror 5's declaration. (Pet'r's Objs. 15–17.)

1   "The prohibition on admitting juror testimony to challenge the validity of a

2   verdict is longstanding." *United States v. Leung*, 796 F.3d 1032, 1033 (9th Cir. 2015)

3   (citation omitted). "[T]his principle is found in Federal Rule of Evidence 606(b),

4   which is a powerful shield against the efforts of litigants to overturn verdicts based

5   on the real or perceived flaws of the juries that decided their cases." *Id*.

6   Under Rule 606(b), "a juror may not testify about any statement made or

7   incident that occurred during the jury's deliberations; the effect of anything on that

8   juror's or another juror's vote; or any juror's mental processes concerning the verdict

9   or indictment." Fed. R. Evid. 606(b)(1). Although the Rule contains exceptions for

10   testimony about "extraneous prejudicial information" or "outside influence" that

11   tainted the verdict, Fed. R. Evid. 606(b)(2), "juror testimony regarding the jury's

12   'internal processes' is categorically barred," *Leung*, 796 F.3d at 1035 (citation

13   omitted).[10]

14   Here, the Court finds that Juror 5's testimony recounting Juror 6's statement

15   falls squarely within the Rule 606(b) prohibition for at least two reasons. First, the

16   statement at issue was a "statement made . . . during the jury's deliberations." Fed.

17   R. Evid. 606(b)(1). The declaration itself states that Juror 6 made his comments

18   "[d]uring deliberations" when the jurors "first went around the table and each said

19   which way we were leaning, and why." (ECF No. 5, Attach. 6 at 274.) Thus, the

20   statement is inadmissible by the plain language of the Rule. *See United States v.

21   Farmer*, 717 F.3d 559, 565 (7th Cir. 2013) ("Rule 606(b)(1) bars juror testimony on,

22   and court consideration of, the jury's internal deliberations, including the jurors'

23   discussions and mental processes.").

24   Second, Juror 6's statement involves his "mental processes concerning the

25   verdict." Fed. R. Evid. 606(b)(1). The affidavit states that Juror 6 gave as his reason

26

27   _____

[10] Rule 606(b)(2) also contains an exception for testimony about whether "a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2)(C). That exception is not at issue here.

28

for "leaning" towards a guilty vote that "he figured the District Attorney knew what he was doing." Such reasoning, even as it involves an apparent bias in favor of the prosecution, is part of Juror 6's thought processes concerning the verdict, and so is shielded by Rule 606(b). *United States v. Pimentel*, 654 F.2d 538, 542 (9th Cir. 1981) ("Testimony of a juror concerning the motive of individual jurors and conduct during deliberation is not admissible."); *Hatcher v. County of Alameda*, No. C09–01650 TEH, 2011 WL 4634053, at *4 (N.D. Cal. Oct. 5, 2011) (testimony stating that the jury reached its decision based on the fact that Plaintiff was a prisoner, and not on the merits of the case, was barred under Rule 606(b) because it contained "only information about jury motives and personal bias"). Thus, Juror 5's testimony regarding Juror 6's statement is inadmissible under Rule 606(b).[11]

Ali contends that Rule 606(b) aside, the Supreme Court's decision in *Warger v. Shauers*, 135 S. Ct. 521 (2014), requires admission of Juror 5's declaration to protect Ali against "extreme" misconduct by Juror 6. (Pet'r's Objs. 16:20–17:6.) In a footnote in *Warger*, the Supreme Court stated that "[t]here may be cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged." 135 S. Ct. at 529 n.3. Ali contends this is such a case.

Ali's argument is unpersuasive on the merits, but also fails for a more fundamental reason—it is not based on clearly established federal law. In *Warger*, the Court expressly declined to consider what would constitute a case of juror bias so

---

[11] Ali argues that Juror 6's statement indicated a refusal to deliberate because, according to Juror 5, he "never said another word" after making his initial remarks. This is unpersuasive. As the California Court of Appeal reasonably concluded, Juror 6's comments were statements of the rationale for his views on Ali's guilt. In other words, the statements themselves constituted deliberation. And even if Juror 6 "never said another word" after his initial comments, the Court cannot assume, without more, that this silence reflected an unwillingness to listen and consider other viewpoints as other jurors shared their thoughts. Thus, the Court finds that Juror 5's declaration is not evidence of Juror 6's refusal to deliberate. *See People v. Thompson*, 231 P.3d 289, 339 (Cal. 2010) (finding that juror declarations did not indicate a refusal to deliberate where the declarations failed to "present examples of objective failure to deliberate, such as jurors who turned their backs or otherwise objectively segregated themselves from deliberations").

extreme that a defendant would be entitled to pierce jury deliberations to preserve the jury trial right. The Court stated: "We need not consider the question . . . for those facts are not presented here." *Id*. Thus, because the Supreme Court has not determined the issue, there is no "clearly established" federal law to which the state court was required to adhere. *See Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) (per curiam) (holding that a state court decision cannot be contrary to clearly established federal law where no decision of the Supreme Court "squarely addresses the issue" or provides a "clear answer to the question presented"). If anything, the Supreme Court's relevant holdings indicate that Ali's right to an impartial jury was protected by basic features of the trial process that guard against juror prejudice. *See Warger*, 135 S. Ct. at 529 ("Even if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered."); *Tanner v. United States*, 483 U.S. 107, 127 (1987) (finding that a defendant's Sixth Amendment right to an unimpaired jury is protected by, among other things, the *voir dire* process, the ability of the court and counsel to observe jurors during the trial, and the ability of jurors to make pre-verdict reports of inappropriate juror behavior). The California Court of Appeal's decision was not contrary to these holdings.

Finally, Ali argues that the California Court of Appeal's denial of his claim of juror misconduct was contrary to *Irvin v. Dowd*, 366 U.S. 717 (1961). In *Irvin*, a capital murder case, the pretrial publicity reached a level of such intensity and pervasiveness that two-thirds of the impaneled jury admitted to believing the defendant was guilty before hearing any testimony. *Id*. at 727–28. Noting the "pattern of deep and bitter prejudice shown to be present throughout the community," the Supreme Court concluded that the defendant's trial failed to meet constitutional standards of impartiality. *Id*.

In light of the extreme circumstances at play in *Irvin*, Ali's reliance on that

1    case is misplaced. Although *Irvin* did not involve Rule 606(b), the build-up of

2    prejudice described in that case was such that it would have constituted "extraneous

3    prejudicial information" or an "outside influence" plainly admissible under the Rule.

4    If Ali was seeking to introduce evidence of the kind of intense, community-wide

5    prejudice found in *Irvin*, Rule 606(b) almost certainly would not bar admission.

6          Here, however, the alleged bias was voiced by a *single* juror *during* jury

7    deliberations. At no point in his declaration does Juror 5 suggests that Juror 6's

8    apparent bias in favor of the DA was the result of "extraneous prejudicial

9    information" or "outside influence," let alone of the scale and scope that compelled

10   the *Irvin* Court to find a violation of the right to an impartial jury. Thus, *Irvin* does

11   not support the argument that Juror 6's alleged bias shows that the verdict was not

12   based on the evidence. Juror 6's belief that the "District Attorney knew what he was

13   doing" simply does not constitute the type of extraneous, pervasive prejudice found

14   in *Irvin*.

15         In sum, the portion of Juror 5's declaration describing Juror 6's statements

16   during deliberations was inadmissible under Federal Rule of Evidence 606(b), and its

17   admissibility was not otherwise required by *Warger*. In addition, Juror 6's apparent

18   bias in favor of the prosecution was not the type of extraneous, pervasive prejudice

19   that infected defendant's trial in *Irvin*. Thus, the Court concludes that the California

20   Court of Appeal's resolution of this claim was neither contrary to, nor an

21   unreasonable application of, clearly established federal law. Ali is not entitled to

22   habeas relief on this claim.

23   **D.    Cumulative Error**

24         Ali contends that the cumulative effect of the above alleged constitutional

25   errors violated his due process and fair trial rights. (Pet'r's Objs. 18.) The California

26   Court of Appeal denied this claim, finding there could be no cumulative error where

27   none of Ali's individual claims had merit. The magistrate judge similarly found that

28   "[b]ecause no errors occurred, no cumulative error is possible." (R & R 73.)

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers*, 410 U.S. at 290 n.3). This occurs where the aggregate impact of individual errors "renders the resulting trial fundamentally unfair." *Id*. Under the cumulative effects doctrine, habeas relief is warranted "when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (quoting *Parle*, 505 F.3d at 933).

Having reviewed the grounds for relief that Ali pursues on objection, the Court has determined that no errors occurred. As a result, there are no errors to accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (explaining that where "no error of constitutional magnitude occurred, no cumulative prejudice is possible") (citation omitted). Thus, the California Court of Appeal's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Ali is not entitled to habeas relief on this claim.

## CONCLUSION AND ORDER

Federal habeas review serves a vital function in our federal system. Deeply rooted in this Nation's constitutional traditional is the belief that the diffusion of power between the Federal Government and the States provides an indispensable safeguard for individual liberty. *See, e.g.*, The Federalist No. 51, at 323 (James Madison) (C. Rossiter ed., 1961) ("In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people."). Federal habeas review advances this liberty-preserving ideal by ensuring that state criminal processes conform to federal constitutional requirements. *See* Gary Peller, *In Defense of Federal Habeas Corpus Relitigation*, 16 Harv. C.R.-C.L. L. Rev. 579, 668 (1982)

1   ("[F]ederal habeas corpus review exists not only to *correct* errors that state courts

2   may make in applying constitutional law in particular cases, but also to *deter* state

3   courts from misconstruing constitutional guarantees."). Where a state prisoner attacks

4   his conviction on federal grounds, providing the prisoner a federal forum in which to

5   relitigate his claims helps to check underenforcement of constitutional values by the

6   States and maintain a relative equilibrium in the federal-state balance. *See* Larry

7   Yackle, *Explaining Habeas Corpus*, 60 N.Y.U. L. Rev. 991, 1008 (1985) ("The

8   establishment of collateral review through habeas did not represent a brazen grab for

9   national power at the expense of the states, but rather an attempt to ensure the

10  enforcement of unpopular substantive principles that the state courts might not

11  respect.").

12         Although critical in function, however, federal habeas review after AEDPA is

13  narrow in scope. Under AEDPA, when a state court has adjudicated a federal claim

14  on the merits, a federal court may not grant habeas relief on the claim unless the state

15  court's decision was contrary to, or involved an unreasonable application of, clearly

16  established federal law, or was based on an unreasonable determination of the facts.

17  28 U.S.C. §§ 2254(d)(1), (d)(2). The Supreme Court's line of decisions interpreting

18  AEDPA has steadily expanded the degree of deference that federal courts owe to the

19  states when reviewing constitutional challenges brought by state prisoners. This has

20  narrowed the scope of federal habeas review and restricted the ability of federal

21  courts to provide post-conviction relief. Commentators have offered thoughtful

22  critiques of these doctrinal developments. *See, e.g.*, Stephen R. Reinhardt, *The*

23  *Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever*

24  *Increasing Limitations on the Development and Enforcement of Constitutional Rights*

25  *and Some Particularly Unfortunate Consequences*, 113 U. Mich. L. Rev. 1219

26  (2015). But this criticism, however warranted, does not lessen this Court's obligation

27  to faithfully follow Supreme Court law.

28         Here, the Court concludes that the California Court of Appeal's denial of Ali's

claims for relief was neither contrary to, nor an unreasonable application of, clearly established federal law. The hearsay statements by House and Porter were either not against their penal interest or were not sufficiently reliable to require admission under *Chambers*; the evidence was insufficient to require the trial court to give a jury instruction on third-party culpability under *Mathews*; Juror 5's declaration recounting Juror 6's statements during deliberations was inadmissible under Rule 606(b); and there was no cumulative error because no individual error occurred. Thus, Ali is not entitled to federal habeas relief.[12]

For the foregoing reasons, the Court **OVERRULES** Petitioner's objections, **ADOPTS** the Report and Recommendation, and **DENIES** the First Amended Petition for Writ of Habeas Corpus. The Clerk of Court shall enter judgment in favor of Respondents and close the file.[13]

**IT IS SO ORDERED**.

**DATED:  February 22, 2017**

Hon. Cynthia Bashant
United States District Judge

---

[12] The Court has also reviewed Magistrate Judge Gallo's conclusions on the eight claims for relief to which Ali has not objected and finds the magistrate judge's reasoning sound and his conclusions well-grounded in law. The Court approves and adopts these findings.

[13] Under 28 U.S.C. § 2253(c)(1), a petitioner may not appeal a final order in a federal habeas proceeding without first obtaining a certificate of appealability ("COA"). Rule 11(a) of the Rules Governing Section 2254 Cases requires a district court to issue or deny a COA when it enters a final order adverse to the petitioner. A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Ali has not made the requisite substantial showing. Reasonable jurists would not find the Court's resolution of Ali's constitutional claims debatable or incorrect. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, the Court DECLINES to issue a COA.